**Raul MAGDALENO, Plaintiff,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant.**

No. Civ.A. 96–B–2530.

United States District Court, D. Colorado.

March 2, 1998.

Donald F. D'Antuono, Waltz, D'Antuono & Coan, Denver, CO, Gary K. Wood, Cheryl A. Rose, Dan A. Ribble, Youngdahl, Sadin & Morgan, P.C., Denver, CO, William Kvas, Hunegs, Stone, Koenig, LeNeave & Kvas, P.A., Minneapolis, MN, for Plaintiff.

Frederick T. Martinez, Walter J. Downing, Knudssen, Berkheimer, Richardson, Endacott & Routh, Denver, CO, for Defendant.

### ORDER

BABCOCK, District Judge.

Defendant, Burlington Northern Railroad Company (BNRC), pursuant to Fed.R.Evid. 104, 401, 402, and 702, moves for an order excluding certain evidence that plaintiff intends to introduce at trial. The evidence emanates from Stephen Konz, Ph.D. (Dr. Konz), a retired Professor of Industrial Engineering and an expert in the field of ergonomics. During the pretrial conference of February 26, 1998, the parties declined the court's offer to conduct a Fed.R.Evid. 104(c) hearing and chose to submit the motion on the briefs and attached exhibits. The motion is adequately briefed. For the reasons set forth below, I grant in part and deny in part BNRC's motion in limine.

### I. BACKGROUND

Plaintiff, Raul Magdaleno (Magdaleno), commenced his employment with BNRC as a machinist in 1978. Magdaleno alleges that he suffered injuries to his wrists and hands because of the conditions present at BNRC's Alliance, Nebraska repair facility.

■ Magdaleno commenced this action on October 31, 1996. Magdaleno's complaint alleges that BNRC negligently caused him to incur injuries to his hands and wrists in violation of the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (1994) (FELA). Pursuant to the FELA, a railroad has a nondelegable, continuing duty to exercise reasonable care in furnishing its employees a safe place to work. *Atchison, T. & S.F. Ry. v. Buell*, 480 U.S. 557, 558, 107 S.Ct. 1410, 1411–12, 94 L.Ed.2d 563, (1987); *Bailey v. Central Vermont Ry.*, 319 U.S. 350, 353, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943).

BNRC argues the opinions and reports of Dr. Konz are entirely inadmissible pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). BNRC attacks the factual foundation and methodology of Dr. Konz's opinions. Magdaleno responds that BNRC misapplies *Daubert* and overlooks the factual underpinnings of Dr. Konz's opinions.

### II. STANDARD FOR ADMISSIBILITY OF SCIENTIFIC EVIDENCE

Fed.R.Evid. 702 governs the admissibility of expert testimony. It provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. This rule imposes two requirements on the admissibility of expert testimony. First, the expert must be qualified by specialized knowledge, skill, experience, training or education to testify on the

subject matter of his or her testimony. *Summers v. Missouri Pacific Railroad System,* 132 F.3d 599, 603 (10th Cir.1997). Second, the testimony must concern "scientific, technical or other specialized knowledge," that assists the trier of fact. Fed.R.Evid. 702; *Summers* at 603–604. In *Daubert,* the Supreme Court interpreted this language to require that expert testimony meet a threshold standard of reliability and relevance before it is admitted. The Court reasoned an expert's opinion must be based on "methods and procedures of science," rather than on "subjective belief or unsupported speculation." *Daubert* at 592–593. Further, the expert testimony must "fit" the fact at issue, requiring a valid scientific connection between the testimony and issue sought to be proven. *Daubert* at 593; *Summers* at 603 n. 5.

When faced with a proffer of expert testimony, therefore, the trial judge must act as a "gatekeeper" by assuring the reasoning or methodology underlying the proffered testimony is scientifically valid, and that it applies to the facts at issue. *Daubert* at 593. *Daubert* establishes four factors for trial courts to consider when determining whether a proffer of expert testimony meets minimum standards of reliability: whether the expert testimony (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate for error; and (4) has attained general acceptance in the relevant scientific community. *Summers* at 603 n. 4 (citing *Daubert* at 593–594). The Supreme Court emphasized that the inquiry is flexible and the overriding principle is to ensure that the testimony is scientifically valid. *Daubert* at 595. A *Daubert* inquiry, however, does not focus on whether the expert's opinion is correct; rather, it focuses on whether the opinion is reliable. *Id.*

## III. ANALYSIS

Magdaleno claims that Dr. Konz is an expert in the field of "ergonomics," defined as "an applied science concerned with the characteristics of people that need to be considered in designing and arranging things that they use in order that people and things will interact most effectively and safely. . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 771 (1986). Because BNRC concedes that Dr. Konz is a recognized expert in the field of ergonomics, I move forward to the second inquiry mandated by Fed.R.Evid. 702: whether Dr. Konz's testimony concerns "scientific, technical or other specialized knowledge" that will assist the trier of fact.

### A. Dr. Konz's Opinions at Issue

In connection with different litigation, Dr. Konz visited BNRC's Alliance, Nebraska repair facility in October 1993. The October 1993 visit yielded a report dated January 22, 1994. In this report, Dr. Konz sets forth five opinions, summarized as follows:

Opinion 1: The risk factors for cumulative trauma disorders (CTDs) are repetition, joint deviation, force, and vibration.

Opinion 2: None of the machinists engaged in repetitive activities. Dr. Konz, however, observed joint deviation, force exertion, and vibration.

Opinion 3: BNRC's Alliance, Nebraska repair facility is unsafe because of the risks of CTDs.

Opinion 4: BNRC's failure to employ trained ergonomic experts, failure to instruct employees regarding proper posture, and failure to provide employees with specialized tools exposed employees to greater risks of developing CTDs.

Opinion 5: BNRC should conduct a detailed analysis of workstations and then institute changes.

In connection with this litigation, Dr. Konz submits a supplement to his January 1994 report dated December 16, 1997. The December 1997 report contains two supplemental opinions:

Opinion 6: BNRC knew of the CTD risk factors in 1990.

Opinion 7: Magdaleno began to experience CTS in 1989. BNRC's repair facility caused Magdaleno to incur CTS. Magdaleno's CTS is so great that medical treatment will not permit Magdaleno to recover or avoid pain and loss of function.

### B. Factual Bases for Dr. Konz's Opinions

Dr. Konz's October 1993 visit, made in connection with different litigation, spanned one afternoon and the following morning. He observed machinists at work, measured the weight of "some tools and parts," took photographs, and made a videotape. Dr. Konz admits that the tools, procedures, and equipment that he observed in October 1993 may not represent the working conditions of Magdaleno. (Konz Depo. at 12–13, 17, 49.) Dr. Konz did not meet with or interview Magdaleno prior to drafting the January 1994 report. Dr. Konz never obtained measurements of Magdaleno's body. Dr. Konz failed to measure the duration, joint deviation, posture, or force exertion necessary to operate specific tools. (Konz Depo. at 44–45.) Nor did Dr. Konz measure the temperature of the repair facility or monitor the recovery time permitted BNRC employees after their use of a specific tool. (Konz Depo. at 60–62, 66, 74, 83.) Lastly, Dr. Konz failed to consider non-occupational factors, such as medical histories and non-work activities. (Konz Depo. at 23.) Thus, Dr. Konz made no meaningful attempt to exclude other potential causes of the Magdaleno's injuries.

In preparation for issuance of the December 1997 report, Dr. Konz did not conduct any scientific tests or revisit the repair facility. (Konz Depo. at 11.) Rather, Dr. Konz spoke with Magdaleno over the telephone, reviewed peer literature, 1990–1994 statistical data regarding the prevalence of carpal tunnel syndrome (CTS) among BNRC's Alliance, Nebraska workforce, and deposition testimony of various witnesses. (Konz Report of 12/16/97; Konz Depo. at 11.)

### C. Application of *Daubert* to the Opinions of Dr. Konz

To satisfy its burden of showing admissibility by a preponderance of proof, Magdaleno must show that each of Dr. Konz's seven proffered opinions (1) can be and have been tested; (2) have been subjected to peer review and publication; (3) have a known or potential rate for error; and (4) have attained general acceptance in the relevant scientific community. *Daubert* at 593–594.

First, I note that neither Opinion 2 nor Opinion 6 constitute "scientific, technical, or other specialized knowledge" as defined by Fed.R.Evid. 702. Opinion 2 declares that none of the machinists engaged in repetitive activities, but that the machinists were subject to joint deviation, force exertion, and vibration. Opinion 2 is axiomatic. People deviate their joints, exert force, and incur vibration when performing almost any activity, such as skiing, walking, typing, etc. (Konz Depo. at 64 (noting that one exerts force buttoning a shirt).) Opinion 2 constitutes an observation rather than an expert opinion and is, therefore, not scientific, technical, or specialized knowledge. Dr. Konz may testify regarding these observations, as may any other witness that has observed the repair facility.

Opinion 6 states that BNRC knew that its repair facility presented CTD risk factors in 1990. The opinion relates to the issue of foreseeability of harm. Like Opinion 2, Opinion 6 constitutes an observation rather than an expert opinion. Hence, it is not subject to Fed.R.Evid. 702 scrutiny. To the extent that other rules of evidence may prohibit or allow Dr. Konz to testify regarding Opinions 2 and 6, these issues shall be addressed at trial, if necessary. I subject Dr. Konz's remaining opinions to Fed.R.Evid. 702 scrutiny.

Only Opinion 1 satisfies the minimum standards of reliability established by *Daubert.* Opinion 1 declares that four risk factors contribute to cumulative trauma disorders (CTDs): repetition, joint deviation, force exertion, and vibration. Ample support exists in the scientific community for this conclusion. Numerous epidemiologic studies have developed a correlation between these four factors and CTDs, including carpal tunnel syndrome (CTS). *See* Bruce P. Bernard, Musculoskeletal Disorders and Workplace Factors: A Critical Review of Epidemiologic Evidence for Work–Related Musculoskeletal Disorders of the Neck, Upper Extremity, and Low Back (1997) (1997 NIOSH Study) (over 30 epidemiologic studies have examined physical workplace factors and their relationships to CTS, several of which discuss the

four epidemiologic factors of repetition, joint deviation, force, and vibration.) These published studies have attained general acceptance, have a known rate of error, and the theories they propound have been tested for error. Accordingly, I conclude that Dr. Konz's proffered testimony regarding Opinion 1 is reliable. I also conclude that Opinion 1 would assist the jury by providing a context for later scientific testimony.

■ Opinion 3, Opinion 4, and Opinion 5, however, fail to meet minimum standards of reliability. Opinion 3 declares that BNRC's Alliance, Nebraska repair facility is unsafe because of the risks of CTDs. Opinion 4, which flows from Opinion 3, states that BNRC's failure to employ trained ergonomic experts, failure to instruct employees regarding proper posture, and failure to provide employees with specialized tools exposed employees to greater risks of developing CTDs. Opinion 5, which also derives from Opinion 3, opines that BNRC should conduct a detailed analysis of workstations and then institute changes. All three opinions relate to issues of negligence and general causation of injury.

Opinion 3 is conclusory and unsupported by scientific evidence. Opinion 3 is not the product of any study conducted by Dr. Konz. Dr. Konz admits that he failed to conduct any study to determine the magnitude, duration, or frequency of these three factors. He testified during his deposition:

Q: In these two reports you do not identify a causal relationship between his work habits, his work environment, the tools, equipment and procedure and the onset of carpal tunnel, do you?

Dr. Konz: I guess I'm missing something. I thought I said that there was a lot of risk factors in his job.

Q: That's as much as you go to say. You identify that there's a variety of risk factors associated with being a machinist at the diesel shops in Alliance. Is that right?

Dr. Konz: Yes.

Q: And Dr. Riley identified that there is a number of risk factors as well. Right?

Dr. Konz: Right.

Q: There can be weight, there can be weather, there can be vibration, duration, frequency, the ergonomic posture, the design of the tools, all of the risk factors. Right?

Dr. Konz: Right.

Q: Andy you agree that there's a number of other risk factors, such as one's genetic make-up, the fact that a person may be a male or female, a smoker or obese? There's a number of nonoccupational factors as well. Is that fair?

Dr. Konz: I don't think I discussed the nonoccupational, but there are nonoccupational factors, yes.

Q: And that's as far as you go in both of these reports. You never identify that there is a causal relationship between the occupational work that he performed at Alliance and the development of carpal tunnel syndrome, do you?

Dr. Konz: I guess maybe I'm confused here about what you mean by causation.

Q: Do you identify in either of these two probability, that the use of a main bearing gun that weighs approximately forty pounds will cause or contribute to carpal tunnel syndrome?

Dr. Konz: Certainly you can't say that it will cause, although you certainly can say that it might contribute.

Q: The use of it one time period?

Dr. Konz: No.

Q: What conclusions can you draw from that?

Dr. Konz: You cannot. Just like you can't conclude from smoking one cigarette.

Q: Can you give me any number in order to identify the use of a main bearing gun will either cause or contribute toward the onset of carpal tunnel syndrome?

Dr. Konz: No, I cannot.

Q: What about a hock gun, spleen gun, can you identify the use of how many times a person would have to use a hock gun or spleen gun in order to develop carpal tunnel syndrome?

Dr. Konz. No.

Q: Did you do any studies regarding the use of repetition, the posture or the

amount of stress one would have to use in order to operate either. a hock gun, spleen gun, a main bearing gun and the development of carpal tunnel syndrome?

Dr. Konz: No.

Q: Did you use any questionnaires in your work in terms of generating either of these two reports so that you had a uniform standard set of questions that you would ask employees who were similarly situated as the plaintiff?

Dr. Konz: I did not use a questionnaire.

 \* \* \* \* \* \*

Q: No, with regard to force, posture, temperature or vibration, what measurements, besides simply weighing the tools, did you take to quantify the amount of force, the length that a person had to endure a posture, the temperatures within the work environment and the number of cycles or vibration that a worker was exposed to as they were employed as a machinist for the Burlington Northern Railroad in Alliance?

Dr. Konz: No, I did not. This is the kind of thing that someone like Dr. Riley or someone—This is a many, many hour kind of study that would be required.

Q: And you, yourself, did not make such a measurement, generally?

Dr. Konz: I did not.

Q: Generally nor specifically with Mr. Magdaleno?

Dr. Konz. I did not.

(Konz Depo. at 58–61, 82–83 (objections omitted).)

The 1997 NIOSH Study relied on by Dr. Konz cites numerous studies that employ various epidemiologic methods for determining whether a correlation exists between CTS and repetition, joint deviation, force exertion, and vibration. These studies take great pains to document the magnitude, frequency, and duration of the stressors. The clear message of the 1997 NIOSH Study is that the causation of CTDs and the degree of various risks the workstations might possess can be measured, tested and analyzed. To achieve reliability, the analysis should include a method for measuring a worker's exposure to the relevant risk factors: force, posture, and repetition. The scientist should then compare the exposure to known human capabilities to arrive at a probability conclusion. *See* Vern Putz–Anderson, Cumulative Trauma Disorder Manual for Upper Extremity (1987).

Dr. Konz did not make any detailed on-site analysis of the repair facility in operation. His concept of what tasks machinists perform is based exclusively on his brief visit to the repair facility and review of a report prepared by Dr. Michael Riley in 1990, "Burlington Northern Railroad Locomotive and Car Maintenance Repair Facility: Workplace Ergonomics Survey and Analysis of Carpal Tunnel Syndrome Stressors" (Riley Report). The Riley Report, however, also appears to lack empirical evidence.

The Riley Report indicates that Dr. Riley reviewed carpal tunnel syndrome data regarding BNRC's employees and evaluated the entire facility during all shifts. Yet the Riley Report merely comes to the conclusion that "major physical stressors which contribute to CTS are present in most areas of the work environment." Like Dr. Konz, Dr. Riley stopped short of conducting an epidemiologic study to ascertain whether the identified stressors at BNRC's repair facility actually cause CTS or any other CTD. Dr. Konz, therefore, may not rely on the Riley Report as a basis for his conclusion that BNRC's repair facility is unsafe.

In sum, Dr. Konz's methodology is not consistent with the methodologies described by the authors and experts whom Dr. Konz identifies as key authorities in his field. His conclusions stated in Opinion 3 has been neither tested nor subjected to peer review and publication. The potential rate for error of this opinion, while completely unknown, is obviously quite significant. Accordingly, Dr. Konz may not testify regarding Opinion 3, Opinion 4, or Opinion 5 at trial.

 Lastly, I conclude that Dr. Konz is unable to testify as to Opinion 7, which declares that: (1) Magdaleno began to experience CTS in 1989; (2) BNRC's repair facility caused Magdaleno to incur CTS; and (3) Magdaleno's CTS is so great that medical treatment will not permit Magdaleno to re-

cover or avoid pain and loss of function. Dr. Konz, of course, is an expert of ergonomics and is not a physician. He is, therefore, not qualified as an expert to opine as to Magdaleno's medical condition, even if he had examined Magdaleno in 1989, which he did not. Further, the statement that BNRC's repair facility caused Magdaleno to incur CTS, for the reasons set forth above regarding Opinion 3, is inadmissible in accordance with *Daubert.*

As for Dr. Konz's January 1994 and December 1997 reports, the holdings of this order apply equally to the language of the reports. Language not affected by this order may be offered at trial, subject to further scrutiny in accordance with rules of evidence.

Accordingly, I ORDER that:

1) defendant BNRC's motion in limine is GRANTED in part and DENIED in part;

2) plaintiff Magdaleno is precluded from offering at trial the testimony or reports of Dr. Konz regarding Opinion 3, Opinion 4, Opinion 5, and Opinion 7 (as such opinions are categorized above); and

3) plaintiff Magdaleno may offer at trial the testimony of Dr. Konz regarding Opinion 1, Opinion 2, and Opinion 6 (as such opinions are categorized above), in accordance with the limitations discussed in this order.