*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0069P (6th Cir.)
File Name: 01a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GARY W. HARDYMAN,
      *Plaintiff-Appellant,*

      *v.*

NORFOLK & WESTERN
RAILWAY COMPANY;
NORFOLK SOUTHERN
RAILWAY COMPANY;
CINCINNATI, NEW ORLEANS
AND TEXAS PACIFIC RAILWAY
COMPANY,
      *Defendants-Appellees.*

No. 99-4218

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-01103—James L. Graham, District Judge.

Argued: September 22, 2000

Decided and Filed: March 13, 2001

Before: BATCHELDER, COLE, and GIBSON,[*] Circuit
Judges.

_____

[*] The Honorable John R. Gibson, Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Howard M. Hackman, HOWARD M. HACKMAN CO., Columbus, Ohio, for Appellant. Robert Leland Evans, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellees. **ON BRIEF:** Howard M. Hackman, HOWARD M. HACKMAN CO., Columbus, Ohio, for Appellant. Robert Leland Evans, Craig R. Carlson, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellees.

_____

**OPINION**

_____

R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Gary Hardyman filed suit against Defendant-Appellee Norfolk & Western Railway Company ("Norfolk")[1] pursuant to the Federal Employers Liability Act ("FELA"), alleging that as a result of Norfolk's negligence, he developed Carpal Tunnel Syndrome ("CTS") during the course of his employment as a conductor and brakeman for Norfolk. After granting Norfolk's motion in limine to exclude all Plaintiff's proffered expert testimony, the district court granted summary judgment in favor of Norfolk, holding, "As those experts' testimony was the only evidence of causation proffered by plaintiff, the court's ruling on defendant's motion in limine necessitates a finding that plaintiff has failed to show that a genuine issue of fact exists as to whether defendant's alleged negligence was, in whole or in part, the cause of his injury." Plaintiff appeals the district court's decision, asserting: (1) the district court abused its discretion in excluding his proffered

_____

[1]The district court dismissed without prejudice Defendants Norfolk Southern Railway Company and Cincinnati, New Orleans, and Texas Pacific Railway Company.

they have determined to be the diagnostic cause and effect. Furthermore, nothing would preclude expert testimony as to the generally accepted risk factors for the development of CTS, the number of risk factors and the degree to which each was present in Plaintiff's job, and the specific tasks required in each of Plaintiff's job requirements during the course of his employment with Norfolk. Finally, nothing would preclude Plaintiff from testifying as to his work and non-work-related activities. Such testimony, even without expert causation testimony, certainly would be adequate to provide a jury with the "special expertise . . . necessary to draw a causal inference." *See Claar v. Burlington N. R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (holding that expert testimony is necessary to establish causation in situations where "special expertise was necessary to draw causal inference").

**CONCLUSION**

Accordingly, we hold that the district court abused its discretion in excluding Plaintiff's expert causation testimony and erred in granting Norfolk's motion for summary judgment on the ground that Plaintiff failed to show that a genuine issue of fact exists as to whether Norfolk's alleged negligence was, in whole or in part, the cause of his injury. We also recognize that even without expert testimony on the specific question of causation, Plaintiff adduced sufficient evidence to demonstrate a causal connection between his job and his CTS based upon the remaining expert evidence presented in the record. We, therefore, **REVERSE** the district court's decision and **REMAND** the case for further proceedings consistent with this opinion.

thus, diagnostically what he determined as cause and effect. He may not, however, testify as an expert on the causation of Plaintiff's CTS in this case . . . .

*Aparicio II*, No. 393CV7261, slip op. at *3. With regard to Dr. Andres's testimony, the district court decided:

Dr. Andres's testimony, in this instance, serves two purposes. First, Dr. Andres's testimony is aimed at the breadth and depth of knowledge generally known by American industry relative to repetitive motions and its impact upon CTS and epicondylitis. In addition, his testimony may demonstrate when this information was generally known and its acceptance by the scientific community. Second, Dr. Andres's testimony may be used to demonstrate the tasks, general and specific, which are known to cause CTS and edicondylitis. As noted by the Sixth Circuit in *Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, 811 (6th Cir. 1996), from this information "a jury could accept Dr. Andres's testimony and find that a reasonably prudent employer would have known about the risk factors and taken steps to ameliorate them." In addition, *Dr. Andres's testimony will assist the trier of fact in its determination of causation*.

*Aparicio II*, No. 393CV7261, slip op. at *4 (emphasis added). Thus, the district court in *Aparicio II* properly separated the reliable testimony from that inadmissible under *Daubert*, recognizing that even without expert testimony on specific causation, a jury still could reasonably infer causation based upon admissible testimony alone.

Had we determined that the district court in fact did not abuse its discretion in excluding Plaintiff's expert causation testimony, nothing would preclude Plaintiff's treating physicians from testifying that Plaintiff did indeed have CTS and as to what they have found, through their experience, generally has caused their patients to contract CTS, *i.e.*, what

expert testimony as it was sufficiently reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and (2) even without such testimony, the district court erred in granting Norfolk's motion for summary judgment because Plaintiff was not required to present expert testimony on the specific issue of causation in order to establish a causal inference, and such testimony was not in fact the only evidence of causation. For the reasons that follow, we **REVERSE** the district court's decision and **REMAND** the case for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiff worked for Norfolk as a conductor and brakeman from 1967 to 1996. During his employment, Plaintiff performed a variety of tasks, including winding hand brakes, coupling air hoses, throwing switches, pushing and pulling air valve handles, lifting and shaking cut levers, aligning drawbars, carrying tools weighing between 75 and 85 pounds, climbing ladders, and catching, climbing, and holding onto moving locomotive cars. In 1994, Plaintiff was diagnosed with CTS and, under a doctor's supervision, began treating his condition with vitamin supplements and wrist splints. In 1996, a non-work-related heart condition caused Plaintiff to terminate his position with Norfolk. Because the treatment for his CTS had been unsuccessful, Plaintiff underwent surgery on his right hand in late 1997 and his left hand in early 1998.

## DISCUSSION

### I. Standard of Review

We review a district court's decision to admit or exclude expert testimony for abuse of discretion, *see General Elec. Co. v. Joiner*, 522 U.S. 136, 138-139 (1997), finding such an abuse only if we are firmly convinced that the district court erred, *see Greenwell v. Boatwright*, 184 F.3d 492, 495 (6th Cir. 1999). We recognize that deference to the district court's decisions "is the hallmark of abuse of discretion review."

*Joiner*, 522 U.S. at 143.  We review an order by the district court granting summary judgment de novo.  *See Babbitt v. Norfolk & W. Ry. Co.*, 104 F.3d 89, 90 (6th Cir. 1997).  Summary judgment is appropriately granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED R. CIV. P. 56(c).  We must view the record and any inferences to be drawn from the underlying facts in the light most favorable to the party opposing summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II. FELA

We recognize FELA to be "a remedial and humanitarian statute . . . enacted by Congress to afford relief to employees from injury incurred in the railway industry."  *Mounts v. Grand Trunk W. R.R.*, 198 F.3d 578, 580 (6th Cir. 2000) (quoting *Edsall v. Penn Cent. Transp. Co.*, 479 F.2d 33, 35 (6th Cir. 1973)).  Congress intended FELA to be a departure from common law principles of liability as a "response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety."  *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 807 (6th Cir. 1996) (quoting *Sinkler v. Missouri Pac. R.R. Co.*, 356 U.S. 326, 329 (1958)).  FELA provides:

> Every common carrier by railroad while engaging in commerce between any of the several states . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the

that Norfolk & Western was aware of the occupational hazard of repetitive motion injury and that Norfolk & Western would take corrective measures to prevent such injuries.  Dr. Salb's statements also show that some of the tools Aparicio worked with--jack hammers, tampers and impact wrenches--caused vibrations and that a remedial measure to protect against excessive vibration would be to put an anti-vibratory wrap on the handles of such tools.  *This evidence was sufficient to create a jury question as to whether Norfolk & Western's negligence may have caused, even in some small way, Aparicio's injuries*.

*Id.* at 812 (citations omitted) (emphasis added).

Thus, our decision in *Aparicio* instructs that a jury question certainly can be created even without expert testimony going directly to the question of specific causation.  After we reversed and remanded *Aparicio* to the district court, that court was faced with determining the extent of admissibility of the testimony of Dr. Murray and Dr. Andres.  *See Aparicio v. Norfolk & W. Ry. Co.*, No. 3:93CV7261 (N.D. Ohio Aug. 4, 1997) [hereinafter *Aparicio II*].  With regard to Dr. Murray's testimony, the district court decided:

> [T]here is no dispute that Dr. Murray did not visit the worksite, perform independent studies or presents [sic] any methodology by which his conclusions can be scientifically tested, [and] articulated no scientific basis to support his conclusion as to causation. However, Dr. Murray in the first trial did testify [and] can testify again as a treating physician regarding what he found in examining Plaintiff, and what and how the information (history) related by the Plaintiff led the doctor to an analysis of how the injury was caused, based upon his training and experience in treating the maladies of which Plaintiff complained. He may, therefore, testify generally as to what he has found through his experience has caused his patients to contract CTS and epicondylitis,

testify on the issue of causation by work activities. *See id.* Norfolk & Western argued that because no tests or experiments were performed regarding whether plaintiff's work was the cause of his CTS, "[t]he most that can be inferred from the evidence is simply that Aparicio developed these conditions at work." *Id.*

Reversing the district court's grant of judgment as a matter of law, *Aparicio* held that despite this lack of direct testimony on the issue of causation, the "evidence was sufficient to create a jury question as to whether Norfolk & Western's negligence may have caused, even in some small way, Aparicio's injuries." *Id.* The *Aparicio* Court stated:

> The testimony of Dr. Robert Andres, Aparicio's ergonomics expert, shows that there were ergonomic risk factors and known remedial measures that had been described and accepted by the scientific community. This information was widely published in trade and scientific journals. A jury could accept Dr. Andres' testimony and find that a reasonably prudent employer would have known about the risk factors and taken steps to ameliorate them.

*Id.* at 811. *Aparicio* further held:

> Given the "relaxed" standard of causation in Federal Employers' Liability Act cases, we believe Aparicio has presented more than a scintilla of evidence to prove that Norfolk & Western's breach of its duty to him was a causal factor, at least in small part, of his injuries. Favorably construed, Dr. Prible's deposition *would permit an inference* that a person with a risk factor for an injury or illness may result in the person with the risk factor developing the injury or illness. Aparicio and his crew co-worker John Powers testified extensively about the repetitive vibrations and shocks to which workers on the maintenance crew were daily exposed from the various power tools. Dr. Salb's evidence tends to prove

negligence of any of the officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51 (1994). This Court has held that a FELA plaintiff asserting a cause of negligence against its employer "must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Adams v. CSX Transp.*, 899 F.2d 536, 539 (6th Cir. 1990) (quoting *Robert v. Consolidated Rail Corp.*, 832 F.2d 3, 6 (1st Cir. 1987)).

> [The] plaintiff must present more than a scintilla of evidence to prove that (1) an injury occurred while the plaintiff was working within the scope of his or her employment with the railroad, (2) the employment was in the furtherance of the railroad's interstate transportation business, (3) the employer railroad was negligent, and (4) the employer's negligence played some part in causing the injury for which compensation is sought under the Act.

*Aparicio*, 84 F.3d at 810 (citing *Green v. River Terminal Ry. Co.*, 763 F.2d 805, 808 (6th Cir. 1985)).

In *Aparicio*, we addressed a claim of negligence under FELA where the district court had granted defendant's motion for judgment as a matter of law at the close of plaintiff's case. We held that in FELA cases, a jury question is created if:

> the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the

injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due "in whole or in part" to its negligence.

*Id.* at 807 (citing *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506-07 (1957)) (footnotes omitted). As *Aparicio* instructs, a plaintiff pursuing a claim under FELA is required "to present more than a scintilla of evidence in order to create a jury question on the issue of employer liability, but not much more." *Id.* at 810. *Accord Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990) (holding that a trial judge "must submit an [FELA] case to the jury when there is even slight evidence of negligence").

## A. Causation

The test for causation in FELA cases is whether an employer's actions played any part at all in causing the injury. *See Aparicio*, 84 F.3d at 810 ("Given the 'relaxed' standard of causation in Federal Employers' Liability Act cases, . . . we believe Aparicio has presented more than a scintilla of evidence to prove that Norfolk & Western's breach of its duty to him was a causal factor, at least in small part, of his injuries."); *Adams*, 899 F.2d at 539 ("[T]he causation test is whether 'employer negligence played any part, even the slightest, in producing the injury' for which the plaintiff seeks recovery.") (citing *Rogers*, 352 U.S. at 506).

Dispositive of Norfolk's motion for summary judgment was the district court's determination that Plaintiff could not establish the causation element of his negligence claim without expert causation testimony. Prior to granting Norfolk's motion for summary judgment, the district court held a hearing on Norfolk's motion in limine, which sought to exclude the causation testimony of Plaintiff's experts Dr.

acknowledge that the district court was correct in its observation that the relaxed standard for proof of causation in a FELA case does not mean that a FELA plaintiff need not make any showing of causation. But such an observation is inapplicable here. Plaintiff never asserts that he need not make any showing of causation to survive summary judgment; rather, he argues that he has adduced sufficient evidence of causation, even without expert testimony on the specific issue, such that a jury reasonably could infer causation. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 270 (5th ed. 1984) ("Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred.").

In this Court's decision in *Aparicio*, the plaintiff was a track maintenance worker for Norfolk & Western who brought a FELA action alleging that his employer's negligence caused his CTS. *See Aparicio*, 84 F.3d at 803. The plaintiff proffered expert testimony of his physician, Dr. Murray, who had diagnosed plaintiff's CTS, performed four surgeries on him, and determined that he was unable to return to work. *See id.* at 806. Plaintiff also presented the expert testimony of ergonomics expert, Dr. Andres, who testified at trial that there were certain ergonomic risk factors for CTS present at plaintiff's job and known remedial measures that had been described and accepted by the scientific community. *See id.* at 811. Both plaintiff and a crew co-worker testified extensively about the "repetitive vibrations and shocks to which workers on the maintenance crew were daily exposed . . . ." *Id.* at 812. In addition, the depositions of Norfolk & Western's medical director, Dr. Prible, and former medical director, Dr. Salb, revealed that they were aware of the CTS risk factors as well as the professional articles published about CTS. *See id.* In its motion for judgment as a matter of law following the jury's verdict in favor of the plaintiff, Norfolk & Western argued that plaintiff did not and could not prove causation because Dr. Murray did not testify that plaintiff's job caused his CTS and Dr. Andres was not called upon to

There is no exact measure of what constitutes abuse of discretion. It is more than the substitution of the judgment of one tribunal for that of another. Judicial discretion is governed by the situation and circumstances affecting each individual case. Even where an appellate court has power to review the exercise of such discretion, the inquiry is confined to whether such situation and circumstances clearly show an abuse of discretion, that is, arbitrary action not justifiable in view of such situation and circumstances.

(internal quotation marks and citation omitted). In other words, "[u]nder the abuse of discretion standard, an appellate court may overturn a lower court's ruling only if it finds that the ruling was arbitrary, unjustifiable or clearly unreasonable." *Plain Dealer Pub. Co. v. City of Lakewood*, 794 F.2d 1139, 1148 (6th Cir. 1986). Thus, although the district court has wide latitude to determine the admissibility of expert testimony under *Daubert* and its successors, its discretion is not unbridled. After careful review of the entire record, we are firmly convinced that the rationale of the district court did not justify exclusion of Plaintiff's expert testimony. Assuming it is otherwise reliable under *Daubert*, Plaintiff may introduce the testimony of the proffered experts on remand.

### C. Jury Question

We further note that even had the district court not abused its discretion in granting Norfolk's motion in limine, it does not automatically follow that summary judgment in favor of Norfolk was proper. After disallowing all the causation testimony, the district court held that the law requires expert evidence to establish causation, and without it, Plaintiff's negligence claim must fail as a matter of law. In its denial of Plaintiff's motion for reconsideration, the district court stated, "While it is true that there is a relaxed standard for proof of causation in an FELA case, this does not mean that FELA plaintiffs need make no showing of causation." We

Douglas Linz, James A. Dewees, Dr. Renee Blaha, Dr. Donald Behrman, Dr. Maureen Delphia, and Dr. Christopher Cantell.[2] Upon granting the motion in limine, the district court then granted summary judgment in favor of Norfolk, reasoning that without the testimony of these experts, Plaintiff could not establish causation as a matter of law.

### B. Expert Testimony

Rule 702 of the Federal Rules of Evidence states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that when faced with a proffer of expert scientific testimony, Rule 702 requires a district court to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. The district court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-94.

Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate. . . .

---

[2] Although Plaintiff asserts that the district court improperly excluded all these experts, his appeal, like the district court opinion, focuses primarily on the exclusion of Dr. Linz and Mr. Dewees, as only their testimony involved the issue of causation. The other experts were proffered more for the purpose of establishing that Plaintiff did in fact suffer from CTS, a claim not disputed by Norfolk.

Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. . . .    Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation . . . .    Finally, general acceptance can yet have a bearing on the inquiry. A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community.

*Id.* at 593-94 (alteration in original) (internal quotation marks and citations omitted).    *Daubert* established a general "gatekeeping" obligation for trial courts, *see id.* at 597, and this gatekeeping function has since been extended to apply to all expert testimony: specialized, technical, or scientific. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 147-48 (1999).

One appropriate method for making a determination of causation for an individual instance of disease is known as "differential diagnosis," which is the method employed by Plaintiff's experts in this case. "Differential diagnosis" is defined as:

[t]he method by which a physician determines what disease process caused a patient's symptoms.    The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.

FEDERAL JUDICIAL CENTER, *Reference Manual on Scientific Evidence* 214 (1994).  The Fourth Circuit recently addressed

*See Dukes*, 934 F. Supp. at 948.  In *Bennett*, the expert did not meet or interview any of the plaintiffs; he neither took nor obtained any measurements of them; he did no analysis of potential work-related causes, nor did he consider non-work factors; he did not investigate their personal histories, psychological conditions, or non-work activities, nor did he make any meaningful attempt to exclude other potential causes of the plaintiffs' injuries. *See Bennett*, 931 F. Supp. at 492.  In *McIntosh*, a case heavily relied upon by the district court, the plaintiff's experts entirely failed to quantify the plaintiff's exposure to the occupational risk factors:

An independent review of the record testimony by McIntosh's experts reveals a total lack of any objective, quantified measurements regarding any of the alleged work-related risk factors.  For example, Dr. Browning's "quantification" of exposure to any and all risk factors is limited to an overall description of McIntosh's job as "heavy physical . . . work."  His opinion failed to break down McIntosh's exposure into any of the various risk factors and was primarily derived from Dr. Browning's "personal knowledge of the railroad."    Dr. Stobbe continually and exclusively described McIntosh's various tasks as "stressful," requiring a "great amount of force," requiring awkward hand posture," and exposing McIntosh to "vibration."  None of these opinions is in any way quantified.  Jobs are described as done on a "regular basis" and as being "physically strenuous." One is left to guess what this means.

*McIntosh*, No. 495CV90833, slip op. at 23.  Clearly, the evidence presented in *McIntosh* is in stark contrast to the evidence presented in the present case.

We recognize that an abuse of discretion standard of review is highly deferential.  As we stated in *NLRB v. Guernsey-Muskingum Elec. Coop., Inc.*, 285 F.2d 8, 11 (6th Cir. 1960):

*Id.* at 264 (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 157 (3d Cir. 1999) (noting that "even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness")).

In excluding Plaintiff's proffered expert testimony here, the district court relied largely on district court opinions from other circuits. *See Stasior v. Nat'l R.R. Passenger Corp.*, 19 F. Supp. 2d 835 (N.D. Il. 1998) (holding that the ergonomist experts were qualified to testify as experts regarding causal connection between occupational risk factors and employee's CTS but that their proffered testimony was not reliable under *Daubert*); *Magdaleno v. Burlington N. R.R. Co.*, 5 F. Supp. 2d 899 (D. Col. 1998) (excluding expert causation testimony as conclusory and unsupported by scientific evidence); *McIntosh v. Union Pac. R.R.*, No. 495CV90833 (S.D. Iowa, April 7, 1998) (unpublished) (excluding expert causation testimony for lack of objective methodology); *Dukes v. Illinois Cent. R.R. Co.*, 934 F. Supp. 939 (N.D. Il. 1996) (same); *Bennett v. PRC Pub. Sector, Inc.*, 931 F. Supp. 484 (S.D. Tex. 1996) (same).

These cases are distinguishable from the present case on many levels. In *Stasior*, the plaintiff was a reservation sales agent who brought a FELA claim alleging that her work station contributed to her CTS. The evidence established that plaintiff had a low-force, low-repetition job, and the experts were unable to cite to any scientific or epidemiological studies showing that low-force, low-repetition jobs are associated with CTS. *See Stasior*, 19 F. Supp. 2d at 841. One of the excluded experts failed to gather any quantitative data about the plaintiff's workstation and made no attempt to measure the awkward posture and repetition at that workstation. *See id.* at 852. In *Magdaleno*, the expert made no on-site analysis of the repair facility in question. *See Magdaleno*, 5 F. Supp. 2d at 905. In *Dukes*, the expert did not perform any independent studies, nor did he review the existing research for purposes of reaching his conclusions.

the differential diagnosis methodology in making a *Daubert* determination, stating:

> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. *See Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252-53 (1st Cir. 1998). A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). *Accord Glaser v. Thompson Med. Co.*, 32 F.3d 969, 977 n.15 (6th Cir. 1994) ("[In differential diagnosis] [t]he doctor considers all information specific to the case to rule out possible causes and determine the most probable cause(s) of the injury."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758 (3d Cir. 1994) ("[D]ifferential diagnosis generally is a technique that has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results[;] it is a method that involves assessing causation with respect to a particular individual. As a result, the steps a doctor has to take to make that (differential) diagnosis reliable are likely to vary from case to case . . . .") (alteration in original); *Hines v. Consol. Rail Corp.*, 926 F.2d 262 (3d Cir. 1991) (defining "differential diagnosis" as the "process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes of the injuries at issue") (alteration and citation omitted).

Here, although the district court acknowledged that differential diagnosis is an acceptable method of determining causation, the court nevertheless excluded all Plaintiff's proffered expert testimony on the grounds that it was conclusory and unsupported by any objective, reliable methodology. Among the experts proffered by Plaintiff to support a showing of causation was Dr. Douglas Linz, a specialist in occupational and environmental medicine. Dr. Linz employed the differential diagnosis method in reaching his conclusion that Plaintiff's CTS was caused, at least in part, by his work activities. In making his differential diagnosis, *i.e.*, ruling out other causes of Plaintiff's CTS, Dr. Linz took an extensive history of Plaintiff's non-occupational work activities. Dr. Linz determined that Plaintiff had bowled in the past but had quit bowling 10 to 12 years ago; he played golf once a year for the last couple of years, but had played more regularly in the past; he coached softball; he played no racket sports; he performed no keyboard work; he did not use a power saw; and he used a wood stove but bought the wood precut. Upon examining Plaintiff and reviewing his medical and employment history, Dr. Linz submitted a report, stating:

> It is my opinion, to a reasonable degree of medical probability that Mr. Hardyman had bilateral carpal tunnel syndrome, right more so than the left, causally associated with his hand intensive work as a brakeman/conductor at the railroad. This work was hand intensive and involved a forceful use of the hands at extremes of posture, particularly when involved with coupling airhoses, setting and releasing hand brakes and throwing switches repeatedly throughout the workday. There is no history of any other more likely cause for the development of carpal tunnel syndrome, either based on his medical history or his nonoccupational hand history. . . .

> Although Mr. Hardyman's work did not involve typical monotonous repetitive hand activities which have been the subject of study in the occupational carpal tunnel epidemiology literature, his job did involve hand

dose/response relationship or threshold level will always vary from individual to individual. Such a requirement essentially would foreclose plaintiffs from recovering for CTS against negligent employers unless their particular job has been the subject of a national, epidemiological study on CTS.

The Fourth Circuit recently addressed this very issue when it held that an expert's causation testimony, which was based on differential diagnosis, was sufficiently reliable under *Daubert* to be admitted. *See Westberry*, 178 F.3d at 266. In *Westberry*, the plaintiff brought a products liability action against his employer, claiming that a talc product used in the employer's manufacturing process caused his severe sinus problems. The plaintiff's proffered expert testimony was the principal evidence of causation, and the employer argued that it was inadmissible because the expert had no scientific or epidemiological studies and no laboratory data to support his conclusion that the inhalation of talc caused plaintiff's sinus disease. *See id.* at 262. The employer also argued that the expert's differential diagnosis was unreliable because although the expert could "rule out" causes of plaintiff's sinus disease, he could not "rule in" causes. *See id.* at 263. Finally, the employer argued that plaintiff's expert could not "rule in" talc as the cause of plaintiff's injury because he had no means of accurately assessing the threshold level of exposure required to produce the onset of plaintiff's sinus problems. *See id.*

The *Westberry* Court rejected the employer's assertions, recognizing that:

> while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

Q.  So we don't have any studies which really tells us how much repetition is too much or how much force is too much.  You agree with that, correct?

A.  Right.

Finally, it is important to note that Mr. Dewees, like Dr. Linz, also ruled out Plaintiff's non-work related risk factors. Mr. Dewees testified:

A.  [I] asked him about any particular personal health problems, also discussed a little bit about what kind of activities he participated in outside of his–of his work with the railroad.

· · · ·

Q.  You talked to Mr. Hardyman about his nonwork-related activities?

A.  Uh-huh.

Q.  Did you find–did you find anything in his nonwork-related activities that would be a cause or risk factor for carpal tunnel syndrome in his case?

A.  From his statement–I asked him that.  He said that–I think he had played some baseball or played softball occasionally, but I couldn't tell that the–that that would be significant enough to be the primary cause of his condition.

Thus, it appears that the district court either failed to recognize that both Dr. Linz and Mr. Dewees in fact did use a method of differential diagnosis in determining causation, or it simply refused to accept this method.  We further recognize that it makes little sense to require a plaintiff to establish a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad brakemen and where the

intensive work which involved risk factors for the development of carpal tunnel syndrome including, by history, high grip strength forces, repetitive flexion and extension at the wrists and work with the hands in a [sic] sustained awkward postures.

Dr. Linz explained the method he applied to reach his conclusion that Plaintiff's CTS was causally connected to his work activities:

[O]nce we get beyond the issue of general causation and get away from evaluating and criticizing the literature whose only purpose really is to establish how well-established is this work [sic] causation in general, then we get to specific causation.  And the approach to specific causation is really quite difficult.  We are looking at, number 1, whether or not the person has carpal tunnel syndrome. It is absolutely clear in this case that he did.  Number 2, does he have documented medical conditions which might be significant contributors to his condition.  That was evaluated by me and I felt that he did not.  The third is whether his work activities are significantly more hand intensive than his nonwork activities, and in addition are his work activities significantly more hand intensive than other jobs [sic] through my experience over nearly 20 years of doing occupational medicine.

And in my opinion, number 1, he had no medical conditions contributing to this condition of significance, that his nonwork activities were relatively nonhand intensive, and that his hand intensive work activities over the years associated with the activities that you have described as a brakeman and conductor were in my opinion significant and significantly more stressful biomechanically in terms of hand use than other jobs.

Although the district court acknowledged that differential diagnosis is an acceptable method of determining causation,

it not only failed to recognize that Dr. Linz applied a method of differential diagnosis in reaching his conclusion, it seemed actually to reject this method, stating:

[T]he expert must have either conducted his own study to determine the causation of the plaintiff's injury, or he must be able to point to scientific or epidemiologic evidence establishing a direct link between the plaintiff's activity and his occupational activity and injury.

Here, Dr. Linz did conduct his own study to determine the cause of Plaintiff's injury, but the study was not one that evaluated CTS and railroad brakemen in general; rather, it was limited to an evaluation of the Plaintiff himself, which goes to the heart of differential diagnosis. Furthermore, differential diagnosis is not a method which lends itself to establishing a "direct link" between an activity and an injury. Rather, it is a method by which a physician "considers all relevant potential causes of the symptoms and then eliminates alternative causes . . . ." FEDERAL JUDICIAL CENTER, *Reference Manual on Scientific Evidence* 214 (1994). In other words, it is a process of elimination. Despite this, the district court held that unless Plaintiff could offer a scientific or epidemiological study specifically concerning carpel tunnel syndrome and railroad brakemen, the only way Plaintiff could establish causation would be with the proffer of a known "dose/response relationship" or "threshold phenomenon."[3] Not only does such a requirement ignore the alternative method of establishing causation through differential diagnosis, but it is contrary to the testimony of Plaintiff's experts, *i.e.*, that one simply could not quantify the level or

---

[3] "Dose/Response Relationship" is defined as "[a] relationship in which a change in amount, intensity or duration of exposure is associated with a change–either an increase or a decrease–in risk of disease." FEDERAL JUDICIAL CENTER, *Reference Manual on Scientific Evidence* 174 (1994). "Threshold Phenomenon" is "[a] certain level of exposure to an agent below which disease does not occur and above which disease does occur." *Id.* at 178.

Q.  You would agree and I think you've just indicated, that there--although I know in your view there's a consensus, there are certainly known risk factors. I think you agree that it's not been established [and] that there is not a consensus as to the level or dose of those risk factors which is causative of carpal tunnel?

A.  Right.

Q.  Is that correct?

A.  Yes. But that would be the–you know, the dosage limit is going to be unique to each individual performing the task.

Q.  There just simply aren't studies out there now at least that enable us to document how much repetition is too much or how far or how much exposure or too high a force is too much, correct?

A.  Right. That's why I rely . . . mostly upon the condition that manifests itself through the person who has experienced these activities. Ergonomic correctness is really measured through how well a person relates to the work environment or to the particular task that they perform.

Mr. Dewees also stated:

Q.  You agree the level or dose of these risk factors for CTS --

A.  It will vary from individual to individual.

Q.  Well--and that those levels or the dose of those risk factors has not been established in the literature. You would agree with that?

A.  Right.

40 to 50 lbs. of force to be moved and had to be "impacted" repeatedly with the palm of the hand.

Mr. Dewees's report concluded:

> Out of the five CTS risk factors listed by Dr. Salvendy in the "Surveillance Case Definition for Occupational CTS" Mr. Hardyman's job required at least three or four of them. Therefore, it can be stated with reasonable scientific certainty that his carpal tunnel syndrome is a work-related condition. The job tasks that he has performed regularly over 20 years are a very probable cause of the onset of symptoms or an exacerbation or aggravation of existing conditions.

Despite Mr. Dewees's testimony, the district court held, "It is their inability to objectively quantify the evidence of exposure that leaves plaintiff's experts' testimony unreliable, and therefore inadmissible." The district court also stated:

> [T]he key question as to whether the presence of one or more of the risk factors contributed to plaintiff's injury becomes: How many risk factors, and what level and frequency of exposure to those factors must be present to cause or contribute to causing the condition? This is precisely the question plaintiff's experts are unable to answer.

Not only does this statement call for a dose/response relationship or threshold level where none can be had, it simply ignores the evidence in the record showing that Mr. Dewees in fact did quantify the number of risk factors present in Plaintiff's job and the amount of Plaintiff's exposure to these factors, explaining in detail the number of repetitions and pounds of force required for each of Plaintiff's job tasks.

Mr. Dewees also testified as to the fact that no studies exist regarding a dose/response relationship or threshold level for CTS and railroad brakemen:

dose of risk factors causative of CTS in a manner consistent with a dose/response relationship or threshold level. For example, Dr. Linz testified:

> Q.  And you acknowledge, do you not, that the carpal tunnel syndrome literature, ergonomic or medical literature that exists, does not establish anything with respect to the required dose or threshold level of any of those risks at which we can then determine carpal tunnel will occur? You would agree with that?
>
> A.  That is correct. And that decision, therefore, needs to stay with the examining clinician when addressing issues of specific causation as we have discussed previously.
>
> Q.  Okay. And so there is no dose/response level established for the risk factors for carpal tunnel syndrome in general for any activity, correct?
>
> A.  Well, there are some. I mean, I believe that there is research that shows that jobs that are highly repetitive and highly forceful will in general develop more carpal tunnel syndrome than other types of jobs.
>
> Q.  Okay. There is no dose response standard or threshold levels specifically established for a job such as that Mr. Hardyman had?
>
> A.  That is correct.

Plaintiff also proffered the testimony of James A. Dewees, M.S., C.P.E., a certified professional ergonomist who conducted an extensive investigation of Plaintiff's work conditions, those tasks associated with Plaintiff's position, and Plaintiff's employment history. The following are some of Mr. Dewees's findings as to whether Plaintiff's CTS was in fact work-related:

According to the "Surveillance Case Definition for Occupational CTS" edited by Dr. [Gavriel] Salvendy, evidence of work relatedness must involve "A history of job [sic] involving one or more of the following activities before the development of symptoms:"

1.  Frequent repetitive use of the same or similar movements of the hand or wrist.
2.  Regular tasks requiring the generation of high force by the hand.
3.  Regular or sustained tasks requiring awkward hand positions.
4.  Regular use of vibrating hand held tools.
5.  Frequent or prolonged pressure over the wrist or base of the palm.

The above risk factors are widely accepted by professional ergonomists, industrial hygienists, and other occupational professionals. The greater the numbers of these factors that are present in a task, the greater the risk of developing CTS.

. . . .

A conservative estimate is that Mr. Hardyman spent 25% to 35% (2 to 6 hours) of each typical shift performing forceful manual lifting, pushing, pulling, twisting, striking, and occasionally using awkward positions of the hands and wrists. It is assumed that the remaining 70% to 80% were spent riding the train between stops, writing reports, blowing the whistle, or walking between tasks. Over his 20 years, it is estimated that at least 15,000 hours (20 years x 50 weeks x 5 days x 3 hours) were spent performing the following hand and wrist intensive tasks, keeping in mind that the tasks were more difficult during the winter months:

1.  Setting & releasing hand brakes . . .
2.  Throwing switches . . .

3.  Lifting, pushing, pulling, striking angle cocks (air valve handles) . . .
4.  Lifting cut levers . . .
5.  Coupling air hoses . . .
6.  Catching, climbing and holding on to moving cars . . .
7.  Rolling cars by prying the wheels using a "brake club" . . .
8.  Aligning drawbars, carrying 75 to 85-lb. knuckles and tools, etc. . . .

Mr. Dewees's report described each of these tasks in detail, including the typical number of repetitions and pounds of manual force required per repetition for each task performed by Plaintiff during the course of his employment as a conductor and brakeman for Norfolk. For example, in describing the setting and releasing of hand brakes, Mr. Dewees explained:

Setting brakes typically requires manual "winding" or ratcheting of wheels or levers until the brakes are adequately "tightened." Each setting usually requires 10 to 40 repetitions of increasing force. When working properly, the initial activations require 3 to 4 lbs. of manual force and the final repetitions can require over 80 lbs. [of] force.

In describing the lifting, pushing, pulling, striking air valve handles, Mr. Dewees explained:

A typical angle cock requires lifting the handle to release it, pushing or pulling it laterally until the valve is opened or closed, then releasing the handle. Force to lift the handle on a valve in good condition has been measured at 6 to 8 lbs. and force to push or pull to activate the valve at 15 to 20 lbs. However, it is estimated that 25% to 30% of the angle cocks had been damaged or had not been maintained properly and that the handles required