DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court upon appeal from the Lucas County Court of Common Pleas, which entered a judgment following a jury verdict in favor of appellee, Rodney Cutlip. Because we find that the trial court did not err in conducting the trial, we affirm the judgment of the trial court.
 {¶ 2} Appellee brought the instant suit against appellants Norfolk Southern Corporation and Norfolk Western Railway under the Federal Employers' Liability Act ("FELA"), Section 51 et seq., Title 45, U.S. Code, and the Locomotive Inspection Act ("LIA"), Sections 20701-20703, Title 49, U.S. Code. Appellee alleged that he contracted asthma from inhaling diesel fumes while working for appellants as a locomotive engineer. The case was tried to a jury, and the jury returned a verdict in favor of appellee in the amount of $625,000.
 {¶ 3} Appellee testified on his own behalf at trial. Appellee began working for appellants' railroad in 1967, immediately following high school graduation, in a position known as "fireman." He held this job for approximately six months before joining the United States Marine Corp.; he was sent to Vietnam. After receiving a gunshot wound to the chest, appellee was discharged from the military in 1969. Appellee's chest wound resulted in appellee losing a significant portion of one lung.
 {¶ 4} After recuperating from his injury for six months, appellee went back to work at the railroad. However, he was still having significant health problems related to his wound, and he was "in and out" of veterans' hospitals. After approximately six months back at the railroad, he decided that he had returned prematurely, and he resigned his position. He attended college for awhile and then once again applied for a position at the railroad. He was eventually re-hired in the early 1980s, again starting off as a fireman. After further training and promotions, he began his current job as an engineer.
 {¶ 5} Appellee alleges in this lawsuit that he was unnecessarily exposed to diesel fumes because of certain practices and conditions at appellants' facilities. First, appellee testified that the doors of the locomotive cabs on which he worked were ill-fitting and in poor condition and as a result did not have proper seals. Because the doors were not properly sealed, diesel fumes entered the cab. He also testified that holes in the floor of the cab similarly allowed diesel fumes inside. Appellee indicated that he and his coworkers routinely applied duct tape in an effort to create a seal, but they were not completely successful in keeping the fumes out. Appellee also testified that, as a part of his job, he had occasion to work on engines owned by other railroads, and these other engines had doors that fit properly and were tightly sealed, substantially minimizing the migration of diesel fumes into the cab. According to appellee, he routinely reported that fumes were entering into the cabs, and appellants' managers rarely did anything about it.
 {¶ 6} Appellee also testified about certain of appellants' operating practices that caused him to be unnecessarily exposed to diesel fumes. He testified that engineers were often required to run the engines "long hood forward," which placed the engineer at the back of the engine with the smoke stack in front of him, causing smoke and fumes to travel backwards, towards the engineer. Appellant testified that he had complained on numerous occasions about running the engines long hood forward and appellants' managers usually required them to do so anyway.
 {¶ 7} Appellee also testified that a practice known as "deadheading" contributed to his excessive inhalation of diesel fumes as well. Appellee explained that engineers are only allowed to work a certain number of hours in a row, and they would often reach that limit on the first leg of a trip. Therefore, they could not run the engine on the return trip. In order to get back to their starting point, these employees rode as passengers in a car behind the engine, again down-wind of the diesel fumes, which came out of the first car. Appellee testified that appellants sometimes sent vans out to bring him back to his starting point, but often he had to "deadhead" to get home again.
 {¶ 8} Several of appellee's co-workers also testified, providing corroborating testimony about appellants' practices of deadheading and running engines long-hood forward. They also corroborated appellee's testimony about the condition of appellants' engines and the condition of engines owned by other railroads.
 {¶ 9} Appellee presented the testimony of several experts: Dr. Shakil Khan, appellee's treating pulmonologist; Dr. Ralph Kelly, a medical doctor specializing in internal medicine and occupational health who also holds a masters of public health degree in occupational medicine; and Dr. Robert Vance, an industrial hygienist. Dr. Khan, appellee's pulmonologist, testified that he first saw appellee on December 1, 1997, and he has seen him regularly since then. Appellee's family care physician referred appellee to Dr. Khan to diagnose appellee's shortness of breath, which had been chronic for the past several months. Upon first meeting with appellee, Dr. Khan took notes of appellee's medical history and ordered a pulmonary function test. This test measures how well and in what capacity a patient is able to expel air from the lungs. Appellee's test showed abnormal lung function. After two or three visits, Dr. Khan "narrow[ed] down his diagnosis to reactive airway disease or asthma."
 {¶ 10} Upon initially taking down appellee's history, Dr. Khan learned from appellee that he worked full-time on the railroad, and he testified that to a reasonable degree of medical certainty, appellee's asthma is related to his exposure to diesel fumes. Dr. Khan also learned from taking appellee's history that appellee had smoked in the past but that he had quit sometime around 1990. However, according to Dr. Khan, if smoking played any part in appellee's lung problems, it played a "very negligible" part. According to Dr. Khan, smoking causes emphysema and chronic bronchitis, but it does not cause asthma. Moreover, Dr. Khan knew from the pulmonary function studies that appellee did not suffer from emphysema. Based on these tests and the fact that appellee had quit smoking several years earlier, Dr. Khan formed the opinion that appellee's lung disease was not caused by smoking.
 {¶ 11} Dr. Khan also knew from taking appellee's history that appellee had suffered a gunshot wound to the chest during the Vietnam war. As a result of this wound, a portion of one of appellee's lungs had been removed. Dr. Khan testified that the loss of part of a lung did not play a part in his diagnosis of asthma. According to Dr. Khan, appellee's lung function was measured in proportion to the amount of lung that he has left.
 {¶ 12} Dr. Khan explained that he prescribed a pill and inhalers for appellee, both an inhaled bronchodilator and an inhaled steroid. He also explained on cross-examination and then on re-direct that he was aware from appellee's earlier medical records that appellee had used an inhaler on a handful of occasions in the 1980s and early 1990s. Dr. Khan explained that these were prescribed for acute bronchitis, but appellee had no ongoing asthma-related health concerns at that time.
 {¶ 13} Another expert, Dr. Ralph Kelly, also testified on appellee's behalf. Dr. Kelly was called to render an opinion on a diagnosis for appellee's condition. Dr. Kelly explained that before he arrived at a diagnosis, he examined appellee and ordered various tests, including pulmonary function testing, X-rays, blood tests, an EKG, and hearing tests. He also took a history from appellee and reviewed appellee's previous medical records. Dr. Kelly learned from the history that appellee had been exposed to diesel fumes on the job since about 1984 but that the exposure became greater around 1996 or 1997.
 {¶ 14} After examining appellee, reviewing his history, and reviewing the test results, Dr. Kelly came to the conclusion that appellee had asthmatic bronchitis, a type of asthma, and that it is permanent. Dr. Kelly also believed based on a reasonable degree of medical certainty that this asthma was caused by appellee's exposure to diesel fumes at his job on the railroad. According to Dr. Kelly, it is well-accepted in the medical community that diesel fumes cause asthma. He also testified that, in his opinion, smoking did not cause the asthma for two reasons. First, Dr. Kelly noted that appellee had quit smoking some six or seven years before he began having trouble with asthma. Second, Dr. Kelly testified that, while smoking can cause an aggravation of asthma symptoms, it does not cause asthma. He indicated that this is generally accepted as fact in the medical community.
 {¶ 15} Dr. Kelly also explained in great detail, using charts, how the results of the pulmonary function studies led him to believe that appellant had asthma and not another disease such as emphysema. According to Dr. Kelly, pulmonary function testing is done in two stages: first with the patient having refrained from using bronchodilators and later after the patient has taken bronchodilators. If the patient has asthma, that patient will respond to bronchodilators and the second half of the test will produce results showing much improved lung function. Appellee responded to the bronchodilators. Dr. Kelly agreed with Dr. Khan that appellee's scattered use of inhalers in the 1980s and early 1990s was due to an acute infection, not to asthma.
 {¶ 16} On cross-examination, Dr. Kelly, like Dr. Khan, admitted that he never tried to quantify the volume of diesel fumes to which appellee was exposed; both doctors testified that clinical practitioners do not do such a thing. Both indicated that, in terms of the level of diesel fumes to which appellee was exposed, they were aware only that appellee worked full-time on the railroad.
 {¶ 17} Appellee also offered the testimony of Dr. Robert Vance, a college professor who holds a PhD degree in chemistry. Dr. Vance is also a lawyer and a board certified industrial hygienist who is licensed to practice engineering and forensic toxicology. He is also board certified in hazardous materials management and safety. He was testifying in this case as an industrial hygienist, explaining that such a professional is one who specializes in the "identification, the evaluation and control of toxic substances in the workplace." Dr. Vance testified as to his opinion to a reasonable degree of certainty based on his expertise in his field that diesel fumes cause asthma. (He also identified diesel fumes as "toxic" and explained why, based on the make-up of such fumes.) He then testified that, as a matter of industrial practice in the United States, employers have four duties: First, they have an affirmative duty to identify toxic substances that may be present in the workplace; second, they have an duty to educate (and train) their employees about hazards in their particular workplaces; third, they have a duty to conduct "medical surveillance" or evaluation to ensure that none of the employees are being harmed by toxic substances or other hazards in the workplace; and fourth, they have a duty to control the hazard.
 {¶ 18} Relevant to the fourth duty, the duty to control the hazard, Dr. Vance testified that there are four different methods of controls: (1) engineering controls (devices such as isolation booths to shelter employees from the hazard); (2) administrative controls (rotating workers so as to minimize their exposure to the hazard); (3) work practice controls (choosing the manner of doing a particular job so as to minimize exposure to the hazard); and personal protective equipment (such as providing respirators or other similar equipment). According to Dr. Vance, if an employer fails to identify, evaluate, and control the hazards in its workplace, that employer has violated accepted industrial standards.
 {¶ 19} On cross-examination, Dr. Vance admitted that he never measured the amount of diesel exhaust being emitted at appellants' facilities and he never did any sort of study to determine the amount of exhaust to which appellee was exposed.
 {¶ 20} When appellee finished presenting his case, appellants moved for directed verdict. The trial court denied the motion. After appellants presented their case, the matter was submitted to the jury for deliberation. After deliberation, the jury awarded appellee $625,000 in damages. Appellants now appeal, setting forth the following assignments of error:
 {¶ 21} "Assignment of Error No. 1:
 {¶ 22} "The trial court erred by denying defendants' motions for directed verdict (TR., pp. 836-843; 1138-1142).
 {¶ 23} "Assignment of Error No. 2:
 {¶ 24} "The trial court improperly and prejudicially admitted into evidence certain expert testimony (Tr., pp. 508-509; 537; 540-566; 779-788; 800-803; Khan Dep., pp. 21, 26).
 {¶ 25} "Assignment of Error No. 3:
 {¶ 26} "The trial court improperly and prejudicially admitted into evidence irrelevant evidence regarding working conditions on other railroads (Tr., pp. 379; 385-399; 431-432; 440-444; 448-449; 615-618; 640-642; 651; 682; 709; 743-746; 759; Carlisle Dep., pp. 10-12).
 {¶ 27} "Assignment of Error No. 4:
 {¶ 28} "The jury verdict was improperly and prejudicially influenced by improper, i[n]flammatory argument and statements by Cutlip's counsel (Tr., pp. 324-330; 337-341; 485-489).
 {¶ 29} "Assignment of Error No. 5:
 {¶ 30} "The trial court improperly applied the rate of post-judgment interest established by a state statute rather than the post-judgment interest rate as administered in the federal courts (Judgment Entry)."
 {¶ 31} Appellee sets forth the following cross-assignment of error:
 {¶ 32} "The trial court erred in limiting and restricting the testimony of R. Leonard Vance."
 {¶ 33} We begin by addressing appellants' second assignment of error, in which they argue that the trial court erred in admitting the testimony of Drs. Khan, Kelly, and Vance because their testimony did not meet the requirements for expert testimony set forth in Evid.R. 702 and by the United States Supreme Court in Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579. We recognize that the trial court has broad discretion to make such decisions, and we may only reverse if the trial court abused its discretion. Kumho Tire Co. v.Carmichael (1999), 526 U.S. 137, 152-153. See, also, Peters v. OhioLottery Comm. (1992), 63 Ohio St.3d 296, 299, certiorari denied (1992),506 U.S. 871 (trial courts have discretion to determine which evidence to admit or exclude at trial, and such decisions may not be reversed absent an abuse of discretion). The Supreme Court of Ohio has stated that "[t]he term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 34} Evid.R. 702 provides:
 {¶ 35} "A witness may testify as an expert if all of the following apply:
 {¶ 36} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 37} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 38} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 39} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 40} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 41} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result." Appellants appear to be challenging the expert testimony only on the basis of its reliability under Evid.R. 702(C).
 {¶ 42} In Daubert, the United States Supreme Court explained that the trial court must act as a "gatekeeper" to ensure both the relevance and the reliability of expert testimony before it is admitted at trial. The Court listed factors that a trial court may consider in determining whether expert testimony is relevant and reliable: (1) whether the testimony is based on a theory or method that has or can be tested; (2) whether the testimony is based on a theory or method that has been subject to peer review; (3) the error rate of the particular theory or method; and (4) whether the theory or method has gained general acceptance in the field. Id. at 593-594. However, the Court did not intend in listing these factors to design a rigid inquiry; in fact, the Court specifically stated, "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." The Court also noted that the inquiry is to be "flexible." Id. at 594. The Ohio Supreme Court has adopted the Daubert factors. See Miller v. Bike Athletic Co.
(1998), 80 Ohio St.3d 607, 611. In Kumho Tire, the Court clarified that this inquiry is intended not only for "scientific" expert testimony, but it also serves as the inquiry appropriate for expert testimony that is technical or otherwise based on specialized knowledge. Kumho Tire,526 U.S. at 147.
 {¶ 43} We apply these guidelines first to the testimony of the two medical doctors — Dr. Khan, the treating pulmonologist, and Dr. Kelly, the expert specializing in internal medicine and occupational health. Appellants argue in their second assignment of error that these doctors' testimony does not meet the requirements of Daubert because neither doctor conducted studies to test the amount of diesel exhaust in appellee's work environment and because neither testified as to an "acceptable level" of exposure to diesel fumes.
 {¶ 44} Both physicians are primarily clinical practitioners; they are not primarily engaged in research. Clinical practitioners typically arrive at a diagnosis by using a method known as "differential diagnosis." The Third Circuit has defined this term as follows:
 {¶ 45} "Differential diagnosis is defined for physicians as `the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.' The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable." (Citations omitted.) Kannankeril v. Terminix Internatl., Inc. (C.A.3, 1997), 128 F.3d 802, 807. See, also, Hardyman v. Norfolk Western RyCo. (C.A.6, 2001), 243 F.3d 255, 260-261 (defining "differential diagnosis" in a similar fashion); Baker v. Dalkon Shield Claimant'sTrust (C.A.1, 1998), 156 F.3d 248, 252 (differential diagnosis involves "identifying a medical `cause' by narrowing down the more likely causes until the most likely culprit is isolated").
 {¶ 46} The Sixth Circuit, like other circuits, has held that differential diagnosis satisfies the Daubert requirements for reliability. See, e.g., Hardyman, 243 F.3d at 260-261; Baker,156 F.3d at 252; Heller v. Shaw Indus., Inc. (C.A. 3, 1999), 167 F.3d 146, 154-155;Kannankeril, 128 F.3d at 808; In re Paoli R.R. Yard PCB Litigation (C.A. 3, 1994), 35 F.3d 717, 758-759, certiorari denied (1995), 513 U.S. 1190. The Sixth Circuit has also characterized differential diagnosis as a "standard diagnostic tool" in medicine. See Glaser v. Thompson Med. Co.,Inc. (C.A. 6, 1994), 32 F.3d 969, 978.
 {¶ 47} Because differential diagnosis is essentially a learned process of elimination, it naturally requires the physician to consider all possible causes and to discard those that are least likely. Recognizing this, the Third Circuit has held that, after the testifying physician offers a diagnosis based on differential diagnosis, if the defendant can point to other plausible causes of the illness, the physician ought to be able to offer a reasonable explanation as to why the physician's conclusion remains reliable. See Kannankeril,128 F.3d at 808; In re Paoli, 35 F.3d at 760.
 {¶ 48} In this case, both physicians testified that they personally examined appellee, they reviewed his medical records, they took a history, they ordered tests, and they reviewed the results of those tests. They both also considered other possible causes (such as the chest wound and smoking) and ruled those out as possible causes of appellee's asthma. Based on the law discussed above, we conclude that Drs. Khan and Kelly arrived at their conclusions following a thorough differential diagnosis, and their testimony is therefore reliable under Daubert and Evid.R. 702. See Hardyman, 243 F.3d at 260-261.
 {¶ 49} Nevertheless, appellants contend that Drs. Khan's and Kelly's diagnoses were unreliable because they were not based on studies conducted to determine the actual amount of diesel fumes to which appellee was exposed or studies indicating the level at which diesel fumes would be considered excessive. In other words, appellants contend that the physicians' testimony is unreliable because they did not present testimony about the "dose-response relationship" or a "threshold phenomenon." The Sixth Circuit has defined these terms as follow:
 {¶ 50} "`Dose/Response Relationship' is defined as '[a] relationship in which a change in amount, intensity or duration of exposure is associated with a change — either an increase or a decrease — in risk of disease.' `Threshold Phenomenon' is '[a] certain level of exposure to an agent below which disease does not occur and above which disease does occur.'" Hardyman, 243 F.3d at 262, fn. 3, citing Federal Judicial Center, Reference Manual on Scientific Evidence (1994) 174, 178.
 {¶ 51} The Sixth Circuit has held that a sound differential diagnosis obviates the need for evidence of the dose/response relationship or the threshold phenomenon. Id. In doing so, the court inHardyman relied heavily on the Fourth Circuit's decision in Westberry v.Gislvaved Gummi AB (C.A.4, 1999), 178 F.3d 257. In Westberry, the plaintiffs claimed that the injured plaintiff's sinus problems were worsened because he inhaled airborne talc existing in the defendant-employer's plant. Plaintiffs' medical expert used a differential diagnosis to conclude that talc caused the injured plaintiff's illness. The defendant challenged the expert medical testimony, arguing that because the expert did not rely on epidemiological studies, peer-reviewed studies, animal studies, or laboratory studies, plaintiffs could not "rule in" talc as a cause of the injured plaintiff's illness. (Differential diagnosis, of course, is a process in which physicians "rule out" potential causes.) The defendant also challenged the testimony on the basis that the expert did not rely on studies showing that talc, at any "threshold level," causes sinus problems. The Fourth District held that such studies are not always necessary, stating,
 {¶ 52} "[I]t must also be recognized that `only rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes. ***' Consequently, while precise information concerning the exposure necessary to cause specific harm to humans and exact detail pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation." (Citations omitted.) Id. at 264.
 {¶ 53} In finding that quantitative studies were not necessary to "rule in" talc as a cause for the injured plaintiff's illness, the court noted testimony that: (1) high levels of talc are known to be irritants to mucus membranes; (2) sinuses are mucus membranes; (3) the injured plaintiff had substantial exposure to talc; and (4) talc was released into the air because of the production processes; (5) there was a strong temporal connection between the injured plaintiff's exposure to talc and the worsening of his sinus problems. Id. at 264-265. These factors, taken into consideration for the differential diagnosis, were sufficient to prove causation.
 {¶ 54} Similarly, in Hardyman, where the plaintiff claimed that his job as a railroad brakeman caused his carpal tunnel syndrome, the Sixth Circuit noted that studies did not exist directly linking brakeman job duties to carpal tunnel syndrome. Noting that the nature of differential diagnosis does not lend itself to a "direct link," the court stated,
 {¶ 55} "We further recognize that it makes little sense to require a plaintiff to establish a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad brakemen and where the dose/response relationship or threshold level will always vary form individual to individual. Such a requirement essentially would foreclose plaintiffs from recovering for [carpal tunnel syndrome] against negligent employers unless their particular job has been the subject of a national, epidemiological study on [carpal tunnel syndrome]." Hardyman, 243 F.3d at 265.
 {¶ 56} Both Westberry and Hardyman are similar to the instant case. In the instant case, there apparently have been no studies indicating a dose/response relationship or threshold level for diesel fumes on a railroad. However, there was testimony that: (1) diesel fumes are toxic; (2) diesel fumes cause asthma; (3) appellee had substantial exposure to diesel fumes on the job; (4) appellee has asthma; and (5) his asthma is not related to his prior smoking habit or the chest wound from Vietnam. We find that the expert's testimony on causation was based on a sound differential diagnosis, and we find appellants' second assignment of error not well-taken as it relates to Drs. Khan and Kelly.
 {¶ 57} Appellants also claim in their second assignment of error that the trial court erred in admitting the testimony of Dr. Vance, the industrial hygienist. Similar to their complaints about the physicians' testimony, appellants contend that Vance's testimony was unreliable because he did not participate in studies measuring the effects of diesel fumes on railroad workers, he never measured the amount of diesel fumes in appellants' locomotive cabs, he conducted no studies of appellee's working conditions, and so forth. We find these arguments unpersuasive given that the trial court did not permit Vance to testify as to causation or even negligence in general. Vance testified only as to general industry standards regarding toxic substances in the workplace. Appellants neither challenge Vance's qualifications, nor do they argue that the field of industrial hygiene is not "good science." (They, in fact, presented their own industrial hygienist). We therefore find appellants' second assignment of error not well-taken as it relates to Dr. Vance's testimony.
 {¶ 58} In their first assignment of error, appellant's contend that the trial court erred in not directing a verdict in favor of appellants after appellee presented its case. We review this assignment of error de novo. Goodyear Tire Rubber Co. v. Aetna Cas. Sur.Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4. The Supreme Court of Ohio has indicated that, in FELA cases brought in state court, we are to apply the federal law interpreting FELA for the substantive issues and Ohio law for procedural issues. Vance v. Consol. Rail Corp. (1995),73 Ohio St.3d 222, 227, certiorari denied (1996), 516 U.S. 1073. In Ohio, directed verdicts are governed by Civ.R. 50(A)(4), which sets out the standard for granting such a motion. That rule states:
 {¶ 59} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 60} When a railroad employee is injured, an employer is liable for that injury under FELA if the injury:
 {¶ 61} "result[ed] in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." Section 51, Title 45, U.S. Code. To establish a triable FELA claim, the claimant must establish that the employer's negligence played a part, even the slightest part, in creating the claimant's injury. Hardyman, 243 F.3d at 259. Under LIA, a railroad may only use locomotives that:
 {¶ 62} "(1) are in proper condition and safe to operate without unnecessary danger of personal injury;
 {¶ 63} "(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
 {¶ 64} "(3) can withstand every test prescribed by the Secretary under this chapter." Section 20701, Title 49, U.S. Code.[1]
 {¶ 65} Given the evidence that appellee presented, including the expert testimony that we have already held was properly admitted, we find that reasonable minds could differ on the question of appellants' negligence. Therefore, we cannot say that the trial court erred in refusing to grant appellants' motion for directed verdict. Accordingly, appellants' first assignment of error is found not well-taken.
 {¶ 66} In their third assignment of error, appellants contend that the trial court erred in allowing testimony about the condition of engines owned by other railroads. We review a trial court's decision to admit or deny evidence on an abuse of discretion standard of review. See Peters, 63 Ohio St.3d at 299.
 {¶ 67} As indicated above, several witnesses, including appellee, testified that they had driven locomotives owned by other railroads and these locomotives were consistently in better condition than appellants' locomotives. Appellants contend that this testimony is irrelevant. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.
 {¶ 68} FELA is a negligence-based statute. See Adams v. CSX Transp. (C.A.6, 1990), 899 F.2d 536, 538. A railroad's duty under FELA is to provide for its employees a "reasonably safe place to work." See Bailey v. Cent. Vermont Ry., Inc. (1943), 319 U.S. 350, 352-353. "Reasonableness" is measured by what a reasonably prudent person (or in this case, railroad) would have or could have anticipated under similar circumstances. Aparicio v. Norfolk Western Ry. Co. (C.A.6, 1996),84 F.3d 803, 811; Green v. River Terminal Ry. Co. (C.A. 6, 1985),763 F.2d 805, 809. For this reason, the Sixth Circuit has previously held that the practices of other railroads is relevant in a FELA case to show what is "reasonable." Rodriguez v. Delray Connecting RR (C.A.6, 1973),473 F.2d 819, 821. Because evidence of the condition of locomotives owned by other railroads is relevant to show reasonableness, we find appellants' third assignment of error not well-taken.
 {¶ 69} In their fourth assignment of error, appellants contend that certain testimony was so inflammatory as to warrant a new trial. Specifically, appellants challenges three lines of questioning: First, appellants contend that appellee should not have been permitted to testify about how he sustained a gun shot wound to the chest in Vietnam; second, appellants challenge the trial court's decision to allow appellee to testify that he quit attending college because his GI benefits ran out; and third, appellants contend that appellee should not have been permitted to testify that he failed to follow his physician's advice to quit his job because he (appellee) had "children at home and a family to feed." Again, we review this assignment of error under an abuse of discretion standard of review. See Peters, 63 Ohio St.3d at 29.
 {¶ 70} First, appellants complain about the chest wound testimony. Appellants objected to this testimony at trial, arguing that it was irrelevant. Clearly this evidence was relevant. Because appellee was claiming a lung illness, any previous lung illnesses or injuries were highly relevant. Next, appellants contend that the trial court should not have admitted appellee's testimony that he quit college because his GI benefits ran out. At trial, appellants objected to this testimony, arguing that the testimony was irrelevant and prejudicial. The trial court held that the testimony was relevant because it was a part of his work history, and his work history was relevant to his credibility. We agree. Nevertheless, Evid.R. 403(A) provides that relevant evidence may nonetheless be
 {¶ 71} excluded if its probative value is "substantially" outweighed by its prejudicial effect.[2] While we can see, in the abstract, why appellants may claim that this testimony was prejudicial, we cannot say that the trial court abused its discretion in finding that its probative value outweighed any prejudicial effect. Finally, appellants contend that they are entitled to a new trial because appellee testified that the reason he did not follow his physician's advice to quit his job was because he had "children at home and a family to feed." We note from the record that the trial court sustained appellants' objection to this testimony and instructed the jury to disregard appellee's answer to this question. The jury is presumed to have followed the trial court's instructions. State v. Loza (1994), 71 Ohio St.3d 61,75, certiorari denied (1995), 514 U.S. 1120. Given this set of facts, we cannot say that appellants were so severely prejudiced as to warrant a new trial. Appellants' fourth assignment of error is found not well-taken.
 {¶ 72} In their fifth assignment of error, appellants contend that the trial court erred in ordering post-judgment interest pursuant to state law instead of pursuant to federal law. Federal law on post-judgment interest is embodied in Section 1961, Title 28, U.S. Code, which provides, in pertinent part:
 {¶ 73} "(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. ***.
 {¶ 74} "(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b)(1) of title 31, and shall be compounded annually.
 {¶ 75} "***.
 {¶ 76} "[c](4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section."
 {¶ 77} By its very terms, the statute applies only to cases pending in federal district court and not to any other court. See Section 1961(a), (c)(4), Title 28, U.S. Code. Additionally, as indicated earlier, in FELA cases we are to apply federal substantive law and state procedural law. See Vance, 73 Ohio St.3d at 277. It is clear that questions regarding post-judgment interest (as opposed to pre-judgment interest) are procedural in nature. See, e.g., Harris v. Mickel (C.A.5, 1994), 15 F.3d 428, 431, fn 4; Bailey v. Chattem, Inc. (C.A.6, 1988),838 F.2d 149, 152, certiorari denied (1988), 486 U.S. 1059. Therefore, for post-judgment issues arising in a FELA case brought in state court, state law controls. Accordingly, the trial court did not err in ordering post-judgment interest according to Ohio law, and appellants' fifth assignment of error is found not well-taken.
 {¶ 78} Appellee filed one cross-assignment of error pursuant to R.C. 2505.22. In his sole cross-assignment of error, appellee contends that the trial court erred in limiting the testimony of Dr. Vance. Because we have found all of appellants' assignments of error not well-taken, it is unnecessary for us to consider appellee's cross-assignment of error.
 {¶ 79} Upon due consideration, we find that substantial justice was done the parties complaining, and the decision of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
Peter M. Handwork, P.J., Mark L. Pietrykowski, J., George M. Glasser, J., JUDGE, CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] References in this section to "this chapter" are references to Sections 20701-20703, Title 49, U.S. Code.
[2] Evid.R. 403(A) provides:
 "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."