EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
This matter is before the Court on Defendant's Motion for Clarification Regarding Dispositive Motions Order No. 1 ("DMO 1"), Class Membership and Causation ("Motion for Clarification") (ECF No. 2814), in which Defendant incorporated its Overview Brief on Causation Issues ("Overview on Causation") (ECF No. 2813), Plaintiffs' Memorandum in Opposition to Defendant's Motion for Clarification (ECF No. 3201), and Defendant's Reply Supporting its Motion for Clarification (ECF No. 3563). For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion.
I.
A. Background
The relevant background is set forth in more detail in DMO 1. (ECF No. 1679.) The Court will focus on the portions of the background necessary to address Defendant E.I. du Pont de Nemours and Company's ("DuPont") Motion for Clarification.
The litigation between the parties in this multidistrict litigation ("MDL") began in 2001 in a class action in West Virginia state court captioned Leach v. E. I. du Pont de Nemours & Co. , No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("Leach Case"). The Leach Case ended in November 2004 when the parties entered into a class-wide settlement ("Leach Settlement Agreement"). In the Leach Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately *877 80,000 members of the class ("Leach Class") would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant.
The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study whether there is a connection between C-8 and human disease among the Leach Class. (Leach Settlement Agreement "S.A." at §§ 12.2.1, 12.2.2; ECF No. 820-8.) The Leach Settlement Agreement provides that the results of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.)
In 2011 and 2012, the Science Panel delivered No Probable Link Findings for over forty human diseases and Probable Link Findings for the following six human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The Leach Settlement Agreement provides the following definitions related to the Probable Link Findings:
"Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.
(S.A. § 1.49.) A "Probable Link Finding" means that the "Science Panel's Phase II report concludes that there is a Probable Link between C-8 exposure and Human Disease(s)." (S.A. §§ 1.50, 12.2.3(b)(1).
The Leach Settlement Agreement permits the individual members of the Leach Class who have or had any Linked Disease to pursue claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that ... relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. § 3.3.) DuPont retained the right to contest specific causation and to assert any other defense not barred by the Leach Settlement Agreement.
The parties defined general and specific causation as follows:
"General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.
....
"Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.
(S.A. §§ 1.25, 1.60.)
Alternatively, the Leach Settlement Agreement provides that if the Science Panel delivers a No Probable Link Finding, the individual members of the Leach Class are forever barred from bringing personal injury or wrongful death claims against DuPont based upon their belief that C-8 caused their disease. Once the Science Panel issued its Probable Link Findings, the members of the Leach Class whose claims are based on one or more of the Linked Diseases began to file cases in West Virginia and Ohio. Of the over 80,000 members of the Leach Class, approximately 3,500 filed cases in accordance with the Leach Settlement Agreement. Those actions are centralized in this MDL. Carla Marie Bartlett's case has been chosen as the first bellwether trial and John Wolf's case will be tried second.
*878 B. Dispositive Motions Order No. 1
On December 17, 2014, this Court issued DMO 1, in which it denied DuPont's Counter-Motion for Partial Summary Judgment Regarding Application of the Leach Settlement Agreement ("DuPont's First Motion Regarding Causation") (ECF No. 1032), and granted in part Plaintiffs' Motion for Partial Summary Judgment Under Rule 56 or for Determination of Issues Under Rule 16(C) (ECF No. 820). Those Motions were fully briefed (ECF Nos. 1031, 1152, 1209, 1407) and the Court held oral argument on the Motions on November 13, 2014 ("Motions Hearing"). (Transcript ("Tr."); ECF No. 1519.)
In DMO 1, the Court framed the parties' positions as set forth in their causation motions and at the Motions Hearing as follows:
Relative to the issue of causation, the parties disagree on the function of the Probable Link Findings. The parties agree that they are bound by the Findings. DuPont, however, argues that it is permitted to "point[ ] out the nuances and the limitations of the Science Panel's findings." (Tr. at 27.) DuPont further argues that the Science Panel's Probable Link Findings "include the reasoning and the clarifications on what they did find and, just as importantly, what they did not find." (Tr. at 24.) DuPont scrutinizes the epidemiological analysis within the Science Panel's Findings, pointing out:
And when you look at the probable linked reports, the way they [the Science Panel] did their analysis was the way epidemiologists do it. They look at groups of people, estimate doses, and they compare the lower exposure to the higher exposure.
But when you look through them, they only found associations of increased risk with the highest exposure groups, not with the lowest.
(Tr. at 34.)
DuPont concludes that because of these "limitations" within the Science Panel's Probable Link Findings, it is the individual plaintiffs' burden to show, as part of proving specific causation, "at least two things: What their individual dose was, one; and two, that dose was sufficient to cause the disease at issue." (Tr. at 37; Tr. at 40) ("that they have to show what their individual dose was; and two, come forward with reliable scientific evidence that says, that particular dosage was sufficient to cause."). In other words, DuPont's position is that the Probable Link Findings may not apply to a particular plaintiff, such as those plaintiffs who were in the lowest exposure groups. DuPont posits that dosages of C-8 for individual plaintiffs must be examined and a determination must be made as to whether the Probable Link Finding applies to the individual.
Plaintiffs counter that the parties agreed contractually in the Leach Settlement Agreement that "any issue about the C-8 dosage and whether it's sufficient to have caused this [Linked Disease] is off the table." (Tr. at 37, 44, 45, 51.) Plaintiffs maintain that the dosage level of C-8 that can cause these diseases is a general causation issue, which DuPont clearly agreed to not contest. This Court agrees.
(DMO 1 at 7-9.)
In DMO 1 the Court explained several reasons why DuPont's position is untenable under the Leach Settlement Agreement and concluded:
Accordingly, the Court concludes that if the individual plaintiffs prove that they are Leach Class members and that they suffer or suffered from a Linked Disease, the Probable Link Finding is *879 applicable to them. This means, for example, that the individual plaintiffs are not required to come forward with evidence proving that their individual dosage of C-8 is sufficient to permit the Probable Link Finding to be applied to them. Under these circumstances, by agreeing to the Leach settlement, DuPont has contractually agreed to a finding of general causation.
Id. at 12.
II.
In its Motion for Clarification, DuPont states:
In DMO 1, the Court found that, as part of the individual plaintiffs' case in chief, they would not be required to prove that their individual dosage of PFOA is sufficient to permit the relevant Probable Link report to apply to them. During the March 25, 2015 phone conference, the Court clarified that, while no party can deny that there is a link between PFOA and one of the six Probable Link diseases in a case involving a Leach class member, DuPont could raise dose as part of the weighing between competing risk factors of the amount of increased risk in an individual plaintiff.
(DuPonf's Mot. for Clarification at 1.)
DuPont contends that, "[c]larification is needed as the parties prepare for the initial trials because [the Plaintiffs' Steering Committee] is taking the position that DuPont cannot even refer to the words or concepts of 'dose' or 'exposure' for any reason, while DuPont believes that, even under the Court's current rulings, dose and exposure are important for at least two independent purposes at trial." Id. Specifically, DuPont continues, "PFOA dose and exposure are important as [ (1) ] part of the specific causation analysis for each individual plaintiff .... [and the] concepts are also an important [ (2) ] part of DuPont's liability defenses because dose was always a central consideration in DuPont's evaluation of the possible health effects of PFOA, and in deciding what actions to take." (DuPont's Reply in Support of Mot. for Clarification at 1.)
A. Specific Causation
There is no dispute that the plaintiffs must prove that C-8 specifically caused their Linked Diseases. In their attempt to do so, the plaintiffs' experts utilize differential diagnoses. (Trial Pls.' Expert Reports; ECF No. 3441.) The Court has referred to this type of analysis on several occasions, including the March 25, 2015 discovery dispute telephone conference relied upon by DuPont as reason to bring its Motion for Clarification. It is well-established in the Sixth Circuit that employing a differential diagnosis is an appropriate means to establish causation. See Best v. Lowe's , 563 F.3d 171, 178-80 (6th Cir. 2009) (citing Hardyman v. Norfolk & Ry. Co. , 243 F.3d 255, 260 (6th Cir. 2001) ). "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Hardyman , 243 F.3d at 260. DuPont contends that as part of specific causation, a plaintiff must show that her specific dose of and/or exposure to C-8 was capable of causing her Linked Disease and that it did in fact cause that disease in her.
As it did in its briefing and arguments before the Court on DuPont's First Motion Regarding Causation, DuPont currently insists that to defend against the plaintiffs' attempt to establish specific causation, it is permitted to dissect the "Probable Link reports" to expose their limitations, teasing out what the Science Panel found and what it did not find. DuPont engages in this analysis by reevaluating, inter alia , (1) the populations the Science Panel studied;
*880 (2) the protocols and models used; (3) the mechanisms of action, and (4) the toxicology and epidemiological investigations utilized. According to DuPont, it can determine "whether increasing exposure to PFOA was associated with increasing risk of human disease." (DuPont's Overview of Causation at 7.) DuPont contends that this analysis is necessary because the "dose of PFOA varied widely across class members" and some members' exposure and/or dose were in a particular quartile or group where no statistically significant associations were found. DuPont argues that the "Science Panel understood the word 'among' to mean intermingled with, not 'all.' " (DuPont's Reply in Support of Mot. for Clarification at 2.) Thus, when the Science Panel concluded that there is a link between C-8 and a Linked Disease among the members of the Leach Class, it did not mean that the link was found for every class member. Instead, DuPont continues, the parties must have their experts determine the limitations reflected in the Probable Link evaluations to determine whether the member of the Leach Class had sufficient exposure to C-8 for it to be capable of causing his or her Linked Disease. DuPont concludes that after such analysis, the Science Panel reports show that there are certain members of the Leach Class whose exposure to and/or dose of C-8 was at a level at which the Science Panel found no increased risk of acquiring the Linked Disease with which they suffer, let alone that it is more likely than not that there is a link between their exposure to and/or dose of C-8 and their Linked Disease.
For example, in DuPont's Overview of Causation, it purports to "address[ ] the proper application of the Science Panel's Probable Link reports to the specific causation determinations for Trial Plaintiffs Bartlett and Wolf ...." (DuPont's Overview of Causation at 1.) DuPont contends that Mrs. Bartlett cannot show that her exposure to and/or dose of C-8 is capable of causing her kidney cancer. DuPont reviews the studies conducted by the Science Panel and determines that, accounting for numerous factors, Mrs. Bartlett fits into what it refers to as a low dose/exposure group of females and that group showed no statistically significant increased risk of developing kidney cancer. In application, as in DuPont's Motion for Summary Judgment on the Individual Claims of Trial Plaintiff Bartlett Based on Specific Causation, DuPont posits:
There are no toxicology studies that support PFOA increasing the risk of kidney cancer at the exposure levels claimed by Mrs. Bartlett. [Defense Expert Robert W.] Rickard Report at 7. Further, there is no established mechanism of action by which PFOA could cause kidney cancer at the exposure levels claimed by Mrs. Bartlett. Id.
(DuPont's Mot. for Summ. J. on Bartlett Specific Causation at 6; ECF No. 2816) (emphasis added).
The plaintiffs dispute whether Mrs. Bartlett falls into a low exposure/dose group, asserting that she has significantly-elevated C-8 exposures. (Plaintiffs' Mem. in Opp. to DuPont's Mot. for Summ. J. on Bartlett Specific Causation; ECF Nos. 3196.) Nevertheless, the plaintiffs maintain, it is irrelevant to the issue at hand because DuPont's position is strictly prohibited by the Leach Settlement Agreement. This Court agrees.
While DuPont couches its argument in terms of specific causation, it is unquestionably a challenge to what the parties defined in the Leach Settlement Agreement as general causation. DuPont's position precludes certain Leach Class members from receiving the benefit of the Probable Link Findings based upon an independent analysis of what the Science Panel studies allegedly found and did not find. However, the Leach Settlement *881 Agreement unequivocally provides for application of the Probable Link Finding, i.e. , the conclusion reached by the Science Panel, to every plaintiff who can show that he or she is a member of the Leach Class and has or had one of the Linked Diseases. Addressing this same issue in DMO 1, the Court explained why DuPont's position is indefensible under the Leach Settlement Agreement:
First, the unambiguous language of the Leach Settlement Agreement unequivocally provides for application of the Probable Link Finding to any class member with the Linked Disease for which the finding was issued, and that for those individuals DuPont waived the right to challenge general causation. Specifically, the Science Panel was tasked with determining whether "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." (S.A. § 1.49) (emphasis added). The way in which the Science Panel was required to make such a finding was for the Panel to establish "a protocol for a study of Human Disease among residents exposed to C-8 in the communities served by the Public Water Districts and Covered Private Sources," i.e. , to study human disease among the Leach class members. (S.A. § 12.2.2) (emphasis added).
If the Science Panel found that it was "more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members," the Panel then issued a Probable Link Finding for that specific disease and DuPont waived its right to challenge whether "it is probable that exposure to C-8 is capable of causing" the Linked Disease, i.e. , general causation. (S.A. § 3.3) ("Upon delivery of any Probable Link Finding ... [DuPont] agrees that, in any personal injury or wrongful death action brought by, on behalf of or otherwise pertaining to a Class Member , Defendant [DuPont] will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered ....") (emphasis added). DuPont cannot now prevent a class member from the benefit of such a finding by pointing out the "limitations" in the objective criteria and/or protocols the Science Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel "did not find" in its Probable Link Finding.
Indeed, in the introduction to each Science Panel Probable Link Finding and No Probable Link Finding, the Panel states:
One part of the [Leach ] Settlement [Agreement] was the creation of a Science Panel, consisting of three epidemiologists, to conduct research in the community in order to evaluate whether there is a probable link between [C-8] exposure and any human disease. A "probable link" in this setting is defined in the Settlement Agreement to mean that given the available scientific evidence, it is more likely than not that among Class Members a connection exists between [C-8] exposure and a particular human disease.
http://www.c8sciencepanel.org/prob_link.html (emphasis added).
(DMO 1 at 10.) The Court also specifically addressed DuPont's desire to delve into the Probable Link reports/evaluations issued with the Probable Link Findings explaining "that the Science Panel 'did not limit [its Finding] to only certain exposure groups or only people who were in quartile one versus quartile two [it] said the link existed among that entire group.' " Id. (quoting Tr. at 11).
*882 As the Court further pointed out in DMO 1, "[t]he Leach Settlement Agreement prevents DuPont from challenging the protocols utilized by the Science Panel in analyzing the presence or absence of a probable link between a particular human disease and C-8." Id. at 10-11. Pursuant to the Leach Settlement Agreement, the Science Panel was required to "develop and approve, by a vote of at least two members of the Science Panel, a protocol for a study of Human Disease among residents exposed to C-8 ...." (S.A. § 12.2.2.) The Court explained:
The inquiry in which DuPont engages is directed at the objective criteria and protocols the Science Panel utilized in reaching its conclusion that "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." (S.A. § 1.49.) The Leach Settlement Agreement explicitly provides that the Science Panel shall agree on "objective criteria" and "protocols" to evaluate the available evidence for the purpose of making a Probable Link or a No Probable Link Finding. (S.A. §§ 12.2.3(a); 12.2.3(b).)
Id. at 10.
Nothing DuPont brings before the Court in its Motion for Clarification or Overview of Causation calls into question any of the Court's analysis in DMO 1. However, the Court will provide further explanation of this important issue here and address the arguments DuPont highlights in its current briefing.
The Leach Settlement Agreement set forth in detail the project with which the Science Panel was tasked. The Science Panel engaged in its work in two phases:
Phase I. In the first phase of its work, the Science Panel shall be responsible for the Community Study and establishing, by a vote of at least two members of the Science Panel, agreed upon objective criteria for the Science Panel to evaluate the Community Study, Worker Study and any other relevant studies and/or data to determine, based upon a vote of at least two members of the Science Panel, whether there is an Association between C-8 exposure and any Human Disease(s)....
....
Phase II. If one or more Association Findings is delivered by the Science Panel, the Science Panel shall commence a second phase of work ("Phase II' "). In Phase II, the Science Panel shall establish, carry out and analyze one or more protocols for further study of any Association Finding from Phase I ("Hypothesis Testing Studies") and, upon completion of all Hypothesis Testing Studies, evaluate the available scientific evidence to determine, based upon a vote of at least two members of the Science Panel, whether such evidence demonstrates a Probable Link between C-8 exposure and any Human Disease...
(S.A. §§ 12.2.3(a) and (b).)
The Science Panel engaged in its work for seven years before issuing its Probable Link Findings and No Probable Link Findings. The Leach Settlement Agreement unambiguously requires those Findings, not the way in which the Science Panel reached the Findings reported in its reports/evaluations, to apply to the Leach Class. (S.A. §§ 1.50, 12.2.3(b)(1) (defining a Probable Link Finding as the Science Panel's "conclu[sion] that there is a Probable Link between C-8 exposure and Human Disease(s)") (emphasis added). DuPont's mistake is focusing on the Science Panel's reports/evaluations instead of its Findings. DuPont, however, does not direct the same focus to the No Probable Link Findings. DuPont has received the benefit of the No Probable Link Findings, immunity from lawsuits based on over forty *883 human diseases that tens of thousands of members of the Leach Class believe were caused by their ingestion of C-8 that was released into their drinking water by DuPont. None of those class members may engage in any analysis of the No Probable Link reports/evaluations. The conclusions reached in the No Probable Link reports, that is, the No Probable Link Findings , universally apply to the Leach Class. It is for this reason too that the Court is not persuaded by DuPont's argument that "the Science Panel interpreted 'among' to refer to only part of the whole group - not the whole group." (DuPont's Overview of Causation at 11). Reading the word in context and with a view to its place in the overall contract leaves the meaning absent of ambiguity.
Moreover, accepting DuPont's position would eviscerate the main benefit flowing to the plaintiffs in the Leach Settlement Agreement, i.e. , DuPont's concession of general causation for the Linked Diseases. Thus, as it is with the No Probable Link reports/evaluations, the only relevant aspect of the Probable Link reports/evaluations is the conclusion, which is defined as the Probable Link Finding. Those Findings are applicable to every member of the Leach Class who has or had a Linked Disease. Thus, for example, Mrs. Bartlett is not required to prove that her dose of and/or exposure to C-8 is capable of causing her kidney cancer. The Probable Link Finding applies to Mrs. Bartlett and establishes that it is "more likely than not that there is a link between exposure to C-8 and" her kidney cancer, ("a particular Human Disease among Class Members").
DuPont takes issue with this conclusion maintaining that "[t]he Science Panel's Probable Link evaluation was not a scientific determination of causation." (DuPont's Reply in Support of Mot. for Clarification at 4.) DuPont posits that "[i]n light of the Science Panel's Probable Link evaluations, DuPont's only concession as it relates to the Bartlett and Wolf trials is that it will not claim that C-8 is incapable of causing either kidney cancer or ulcerative colitis at either of their trials." (DuPont's Overview of Causation at 3.) It will, however, claim that Mrs. Bartlett's and Mr. Wolf's exposure to and/or dose of C-8 is incapable of causing kidney cancer or ulcerative colitis. DuPont's position, stated another way, is that while it will not challenge general causation (as that term is defined in the Leach Settlement Agreement), Mrs. Bartlett and Mr. Wolf must still prove it.
To further support its position, DuPont relies upon a letter sent to the Science Panel from counsel for the Leach Class in which that counsel states he is responding to the Science Panel's request "seeking guidance from the Parties" on the probable link standard. (DuPont's Overview of Causation, Ex. B at 1; ECF No. 2813-2.) The letter refers to the probable link standard as it is established in West Virginia case law related to medical monitoring claims and indicates, among other things, that the " 'probable link' test was intended to 'be a relaxation of the traditional requirement that a ... plaintiff prove general causation, that is, that the substance in question causes the disease....' " Id. at 2, 4 ("In short, the Science Panel's sole charge is to determine if, looking at all the available evidence, there is just enough information to tip the scales toward a finding of any link between PFOA exposure and any human disease.").
Leaving aside the issue of whether the Court may even consider this letter to inform the plain language of the Leach Settlement Agreement, it is not incongruent with the Agreement. The Leach Settlement Agreement does not require a finding of general causation to trigger DuPont's concession of general causation, as that term is defined by the parties. Instead, *884 the Leach Settlement Agreement reflects the parties' agreement that a Probable Link Finding triggers concession of general causation, as that term is defined by the parties. The fact that the Probable Link Finding is a lower standard than general causation is irrelevant when the parties have made such an agreement, which they are certainly permitted to and did make. And, further, in the context of the Leach Settlement Agreement, a distinction between conceding general causation and a prohibition to challenging general causation is, in application, one without a difference.
Finally, DuPont's position "that it will not claim that C-8 is incapable of causing either kidney cancer or ulcerative colitis at either of [the bellwether] trials" is based upon its continued reliance on the definition of general causation reflected in toxic tort case law. That definition, however, is different from the one the parties established in the Leach Settlement Agreement. The Court addressed this argument in DMO 1:
Last, the Court finds unpersuasive DuPont's contention that, in spite of the clear contractual language, toxic tort case law informs what the parties meant by general causation because the parties used the same language in the Leach Settlement Agreement that is used in that case law. (Tr. at 28-29) ("[T]he general causation in the settlement agreement is defined the same way consistent with general tort case law, the substance is capable of causing a disease."). In relying on a body of toxic tort federal case law, the Ohio Supreme Court defined general causation as " 'whether a substance is capable of causing a particular injury or condition in the general population.' " Terry v. Caputo , 115 Ohio St. 3d 351, 355, 875 N.E.2d 72 (2007) (citations omitted). That definition, however, is not the same as the one utilized in the Leach Settlement Agreement. The Leach Settlement Agreement defines general causation to "mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease." (S.A. § 1.25.) The Agreement does not include the phrase "in the general population." Nor could it have included that phrase and remain consistent with the other provisions of the Agreement. As the Court just outlined, the Settlement Agreement definitively states that the Science Panel was tasked with studying diseases among the class members exposed to C-8 and determining whether there is a link between that exposure and a human disease among those class members.
(DMO 1 at 11-12.). See also Pluck v. BP Oil Pipeline Co. , 640 F.3d 671, 677 (6th Cir. 2011) (defining specific causation in a traditional toxic tort case where general causation is determined by evaluation of whether a toxic substance is capable of causing disease in the general population).
By way of further explanation, the Leach Settlement Agreement established a novel procedure for dealing with the approximately 80,000 individuals that make up the Leach Class by establishing the Science Panel and directing its work. Unlike the usual situation where epidemiologists start with a chemical exposure and then attempt to define the dose of that chemical which presents a sufficiently increased risk to conclude that such dose is "more likely than not" sufficient to cause a particular disease, the parties directed the Science Panel to follow a very different process. The Science Panel was focused on an identified group of people (the Leach Class) with a defined level of exposure (.05 ppb or greater of C-8 for the period of at least one year) to a particular chemical (C-8) and determine, not how much of the chemical it might take to cause various diseases in humans generally, but which diseases were linked to the actual C-8 *885 exposures in that defined group. The Science Panel's Probable Link Findings are, by agreement of the parties and by definition, links that exist and are "probable" in the entire Leach Class.
B. Liability
DuPont contends that the "concepts" of dose and exposure "are also an important part of DuPont's liability defenses because dose was always a central consideration in DuPont's evaluation of the possible health effects of PFOA, and in deciding what actions to take." (DuPont's Reply in Support of Mot. for Clarification at 1.) The plaintiffs respond that they have never taken the position "that DuPont cannot even refer to the words or concepts of 'dose' or 'exposure' for any reason" and that DuPont cites no evidence to the contrary. Thus, it appears to the Court that there is currently no dispute as to this issue.
III.
For the reasons set forth above, the Court GRANTS DuPont's Motion for Clarification to the extent it requests that the Court clarify DMO 1 and DENIES the Motion in all other regards. (ECF No. 2814.)
IT IS OS ORDERED.